## LOGAN v. LOGAN.

### No. 4827.

Court of Civil Appeals of Texas. Amarillo.

Dec. 13, 1937.

Rehearing Denied Jan. 17, 1938.

516

 

Underwood, Johnson, Dooley & Huff and R. A. Wilson, all of Amarillo, and Frank M. Tatum, of Dalhart, for appellant.

J. B. Honts, B. N. Richards, and Art Schlofman, all of Dalhart, for appellee.

FOLLEY, Justice.

E. V. Logan, plaintiff below, and appellee in this court, was the son of Eugene Logan, deceased, by his first wife. The appellant, who was the defendant below, was the second wife of the deceased and the sole beneficiary under his will, except for nominal sums of $10 to each of the children of deceased by his first marriage. There were no children of the second marriage.

The plaintiff, E. V. Logan, prosecuted this suit in the district court of Dallam county, Tex., against the defendant in her individual capacity and in her capacity as independent executrix under the will of Eugene Logan. The plaintiff alleged that a partnership trust existed between him and his father from 1902 until the death of the deceased in 1935. It seems that in 1889 the deceased left his first family in Young county, Tex., and came to Dalhart some time later, where he became engaged in the livery stable business. In addition to this business, in 1902 he secured a contract with the Rock Island Railway Company to feed cattle to be shipped by the company at various points in New Mexico and Texas. The separation from his first wife culminated in a divorce in 1906 and a division of the property of the first community estate. To this wife was given the title to the community lands in Young county and some property in Tarrant county. The deceased was given title to such property as he had acquired in and around Dalhart at the time of the divorce.

In 1902, the plaintiff, while on his way to the Northwest, stopped off in Dalhart to visit his father. He found his father busily engaged in the above-named enterprises. He began working for his father immediately and claims that a few days thereafter he told his father that he was going on to the state of Oregon. He alleges that his father insisted on his remaining in Dalhart, and in order to induce his son to stay, the father offered to allow him a partnership in his business. He says that his father told him that if he would remain in Dalhart and work for him that the deceased would give him a half interest in his business and in such property as they might acquire from such joint enterprises. The plaintiff remained in Dalhart under such an agreement. The business seems to have been profitable and the revenues from the business were used to buy various houses and lots in the town of Dalhart, as well as notes, bonds, and other securities. That all of such property was, by agreement, placed in the name of the deceased, as a matter of convenience, but that it was understood between the father and son that each should have an equal interest therein. That about the year 1908 the plaintiff married, and he and his wife, Margaret Logan, operated a hotel belonging to the partnership for some time. That he and his father each worked for the joint business without salary except that each withdrew from the business his necessary expenses.

The deceased, Eugene Logan, was married to the defendant on April 13, 1912, and they lived together as husband and wife until the death of the deceased in 1935. It is without controversy that the bulk of the property that deceased held in his own name at the time of his death was acquired after his second marriage. The property that was acquired theretofore

consisted mainly of vacant lots, several rented residences, and the hotel which the deceased and the defendant jointly operated after their marriage in 1912. The plaintiff asserts that the rents and revenues from the various properties were collected by his father and reinvested from time to time in additional properties. After the second marriage of the deceased, several very valuable brick buildings were purchased in the name of the deceased. The plaintiff further alleged that said partnership trust continued to exist until the death of his father, and that an undivided one-half interest in the property which was in the name of his father at the time of his death belonged to the plaintiff.

· The defendant denied that any such partnership ever existed. She further alleged that all of the property that was acquired after April 13, 1912, was the community property of herself and her deceased husband, except such property as was acquired by Eugene Logan with contributions and advancements made by her to her husband from her separate estate. In this connection, the proof showed that she had contributed the sum of $4,300 from her separate estate to her husband with the understanding that such sum should stand as a lien against such property so acquired by such advancements, and to the extent of such contribution she claimed that a trust arose in her favor. She asked for appropriate relief in this particular.

In answer to such allegations of the defendant, the plaintiff pleaded that since the defendant had offered the will of Eugene Logan for probate, having qualified thereunder as independent executrix and accepted the benefits of the will, she was estopped from asserting title to any property except that acquired under the will.

The cause was tried before the court without a jury. The court found that a partnership trust did exist between the plaintiff and Eugene Logan and that the income from the partnership property was reinvested from time to time in other properties taken in the name of Eugene Logan. He further found that the plaintiff owned an undivided one-half interest in all such property, which interest was held for him in trust by Eugene Logan. He also found that about the year 1910 the plaintiff found other employment independent of the partnership, but continued to work upon the joint properties of the partnership, in repairing and improving the same. He found that Eugene Logan continued to manage and look after said property for the mutual benefit of the partnership. He further found that all the property acquired by Eugene Logan after his second marriage was the community property of deceased and the defendant. He found that the defendant had elected to accept under the will of her deceased husband and denied her any recovery for advancements made from her separate estate. The judgment decreed the plaintiff an undivided one-half interest in and to all the property involved except the homestead of the defendant and 20 shares of stock in the First National Bank of Dalhart, which stock had been transferred to the defendant during the lifetime of the deceased as a gift from him to her. The court further decreed that the plaintiff should recover against the defendant only in her capacity as legatee under the will and estate of Eugene Logan, deceased, and not as independent executrix under the will. From such judgment, the defendant appeals.

The defendant complains of the action of the trial court in finding that the defendant had elected under the will of her deceased husband and in denying her recovery for any advancements made from her separate estate, and in refusing her any benefits independent of the will.

We think the law of election is clearly defined in 28 R.C.L. 328, par. 317, in the following language: "Election under a will consists in the exercise of a choice offered the devisee of accepting the devise and surrendering some right of his which the will undertakes to dispose of, or of retaining such right and rejecting the devise. The choice is compulsory between two inconsistent rights or claims where there is a clear intention of the testator that the beneficiary shall not enjoy both. The question of election is largely a question of construction of the will, for the doctrine is founded on the apparent intent of the testator that the legatee shall surrender some right in exchange for the legacy. * * * But a devisee's acceptance of the devise to him does not estop him from asserting his interests contrary to the will where such acceptance is made in ignorance of a material fact a knowledge of which is necessary to enable him to make an intelligent choice."

Again in Schouler on Wills, 6th Ed., vol. 4, 2638, it is said: "An 'election' in equity is a choice which a person is compelled to make between the acceptance of

a benefit under an instrument and the retention of his own property which is attempted to be disposed of by that instrument, and if he takes under the will he must abandon every right and interest which would even partially defeat any of the provisions of that instrument."

In 69 C.J. 1089, par. 2330 and 2331, an election under a will is defined in the following language:

"Election is the obligation imposed upon a party to choose between two inconsistent or alternative rights or claims in cases where there is a clear intention of the person from whom he derives one that he should not enjoy both, the principle being that one shall not take any beneficial interest under a will, and at the same time set up any right or claim of his own, even if legal and well founded, which would defeat or in any way prevent the full effect and operation of every part of the will. The principle underlying the doctrine of election is not statutory, but is purely equitable, and was originally derived from the civil law, although in some states there are statutes declaratory of, or applying, the equitable principle to particular cases. The doctrine of election is generally regarded as being founded on the intention of the testator.

"In order to render an election necessary there must be a plurality of gifts or of remedies, their validity must be established, and their inconsistency proved. It must appear in the will that there was a clear intention on the part of the testator, either express or implied, to dispose of property over whose disposition he has not, as against the party put to his election, the power of disposal, and that the testator has made a valid gift of other property absolutely and actually owned by him to the person with whose property he has thus dealt, the will thus showing an intention on the part of the testator that the beneficiary shall choose whether he will keep that which is already his or renounce it and take in lieu thereof that which the testator gives him, or a situation in which such intention is conclusively presumed, the question of the testator's mistake or ignorance of facts affecting ownership of such property being immaterial. Election cannot be required of a person whose property was not given away by the testator, or who failed to receive under the will any property actually belonging to him, nor can election be required where the testator presumably devised merely his own property, or his own interest in property."

In an early case in this state, Philleo v. Holliday et al., 24 Tex. 38, the Supreme Court, in discussing this question, announced the following rule: "The principle of election is, that he who accepts a benefit under a will, must adopt the whole contents of the instrument, so far as it concerns him; conforming to its provisions, and renouncing every right inconsistent with it; as where the wife claims something under the will which will disappoint the will."

In the case of Dunn et al. v. Vinyard, Tex.Com.App., 251 S.W. 1043, 1046, Judge German, in the opinion, said: "In other words, an election means that a legatee or devisee under a will is put to the choice of accepting the beneficial interest offered by the donor in lieu of some estate which he is entitled to, but which is being taken from him by the terms of the will. When by the express terms of the will the party is put to an election, he must make a choice regardless of the relative value of the two inconsistent rights."

This same rule has been announced recently by the Supreme Court in Dakan v. Dakan et al., 125 Tex. 305, 83 S.W.(2d) 620, which cites many authorities.

From an examination of the will in the instant case, it is our opinion that the testator intended to devise only such property as he owned at the time of his death. The will is as follows:

"Dalhart, Texas, Nov. 16, 1912.

"State of Texas }
"County of Dallam, }

"Eugene Logan, of Dallam Co., Texas, being of sound mind and disposing memory do hereby make and constitute this my last will and testament. I hereby give to each of my children, Willie Logan, Katie, Allen, Vannie Logan, May Carlton, Eula Logan, Jonnie Logan, Allie Logan, Jimmie Logan, Earl Logan the sum of ten dollars each to be paid to them as soon after my decease as conveniently be done after this and all debts paid. I hereby give, devise and bequeath unto my wife, Ida Logan, all property, both real and personal whether belonging to me separately or as my interest in partnership with others of which I may be seated and

possessed, or to which I may be entitled at the time of my death.

"I hereby appoint my said wife as executrix of this my will, without bond and desire that no action be had in the probate court with reference to my estate except the probating of this will, the return of the inventory, and appraisement of property and list of claims belonging to my estate.

"Witness my hand this the 16th day of Nov. 1912.

"Eugene Logan"

We think it is apparent from the face of the will that the testator had no intention of passing his wife's interest in the community estate, if she had such interest.' If he had so intended, the defendant was entitled to her share of community estate in the absence of a will. McClary et al. v. Duckworth et al., Tex.Civ. App., 57 S.W. 317. Regardless of the interest the testator had in the property involved, such interest passed to the defendant under the will. This being true, there was nothing presented to the defendant from which she could elect. If she had a community interest in the property, it either passed to her by the will or under the statute. In either event, all of such property belonged to her after the will was probated. The testator could not pass title by the will to any property that was owned by the son and such interest, if any, was not affected by the will.

The only theory upon which an election could possibly be predicated is that the defendant, in accepting under the will, abandoned her claim for compensation for advances made from her separate estate. As far as the community estate is concerned, such claim for advances would fall for the reason that she received all of the community estate under the will or under the statute. If she had an equitable lien upon her husband's share of the community to secure the repayment of such advances, it would avail her nothing to assert such a lien upon property that she now owns. As far as the property that she received under the will is concerned, she was not compelled to renounce any right she had independent of the will and she did not assert any claim to such property that would defeat any of the provisions of the will. If she had a valid claim against the property of her husband for such advances, such a claim would merely have decreased the share of her husband in the community estate, had there

been an accounting during the lifetime of the deceased. Whatever equity she had in her husband's property by reason of such advancements would not have passed under the will because such equity belonged to her, and not to her husband.

Another element of election is lacking in this case. It is nowhere shown that the defendant ever knew of any partnership existing between her husband and the plaintiff at the time the will was probated. If she was without knowledge of such claim of the plaintiff, she had no facts before her to warrant the necessity of an election. It is reasonable to suppose that her presumption was that she was taking all of the property standing in the name of her husband.

Even though there may have been an election under the will, we think such election has no application to the contest between the plaintiff and the defendant in this case. The plaintiff is not asserting title to any of the property herein, either as an heir of his father or as a devisee under the will. He appears in the case asserting a partnership trust between himself and his father. His contention in this regard is now supported by the judgment of the trial court. If he was a partner with his father, though a silent partner as far as the defendant is concerned, his portion of the partnership estate should be charged with its share of the partnership debts. The fact that one of the partners died would not relieve the plaintiff of his share of such indebtedness. Since the advancements made by the defendant were for the benefit of the entire estate, we think the defendant should have an equitable lien upon the plaintiff's share of any property recovered by him to secure the payment of his share of said debt. The fact that the defendant did not know of such partnership, if such existed, would not alter the liability of the plaintiff for such debt. In 32 Tex.Jur. 358, par. 88, we find this language: "Unknown or secret partners are liable equally with known partners for debts of the firm though the creditor supposed that he was giving credit to an individual only; and this is true regardless of whether the secrecy was fraudulent. A secret but actual partner is bound by a contract made by a managing partner within the fair scope of his authority."

Under all of the above authorities, we think the court erred in holding that the defendant had elected under the

will, but in so far as it relates to the husband's separate or community property, the error is harmless, since the defendant received all of such property under the will. Such error, however, is not harmless as it relates to the equitable lien and indebtedness against the property awarded to the plaintiff by the judgment. The amount of the indebtedness which should be charged to the plaintiff would depend upon the proportion of the property that passes to the plaintiff. Since this case must be reversed upon other sufficient grounds, in view of another trial, we wish to state that the testimony should be specific in this connection. If the court had not denied the defendant recovery in this matter upon the theory that the defendant had elected under the will, as stated in the judgment, we might presume that he was of the opinion that the testimony was insufficient to sustain a finding in favor of the defendant for such indebtedness as against the plaintiff's property. Such presumption cannot therefore prevail in support of the judgment rendered by the trial court. Since the court had all the facts before him with reference to the property and the advances made by the defendant, we think he erred in wholly ignoring the claim of the defendant against the plaintiff's interest in the property upon the theory expressed in the judgment that the defendant had elected under the will and was estopped from asserting any claim independent of the will.

In connection with defendant's contention that the court should have impressed a trust upon the property recovered by the plaintiff for the money she claims to have advanced out of her separate property, it is sufficient to· say that under the record she failed to trace such advancements into any specific property.

The defendant. next raises a far more serious question,· the insufficiency of the testimony to support the judgment of the trial court. The defendant bases this assignment upon two theories, one that the evidence is insufficient to establish the alleged partnership trust, and the other that the proof wherein the plaintiff attempts to trace the partnership funds into the various properties involved is not as clear and convincing as is required by law. After a very careful examination of the evidence in this case, we feel constrained to sustain this assignment, at least in so far, as it relates to the property acquired after the second marriage.

The testimony is very voluminous and we shall undertake to review only the salient features of it. The deceased had been in Dalhart some 13 years when the plaintiff appeared on the scene. During this 13 years he had become established in a lucrative business. In addition to his business interests, he held several commissions as a peace officer and was one of the leading officers apprehending cattle thieves on the New Mexico border. For his services as such peace officer he received a salary. In 1902, after securing the contract from the railway company to feed cattle, his income increased to a considerable extent. At this time, the plaintiff, then a callow youth of 21 years, fresh from the farm in Young county, without business experience, and while on the road to Oregon, stopped off in Dalhart to visit his father. The plaintiff contends that from said visit sprang the agreement whereby he became the owner of an undivided one-half interest in all the property involved in this lawsuit. From this joint enterprise the plaintiff claims that various pieces of property were purchased for the partnership from time to time. This direct association in business with his father continued uninterrupted until about 1910 when the plaintiff secured work in a pool hall and later as a deputy sheriff. It is not contended by the plaintiff that from his salary in such independent endeavors he contributed anything to the purported partnership. After 1910 the only contributions plaintiff seems to have given to the alleged partnership was occasional labor performed by him on various rent houses acquired in the name of the deceased. For this work he admitted receiving some pay, and checks totaling about $700 were introduced as evidence to show that his father and the defendant had paid him for this labor. The plaintiff bases his claim to the property acquired after 1910 and after the second marriage of the father, on the theory that all of such property thereafter acquired was purchased and improved out of the income from the partnership property.

There are several very peculiar circumstances in the record which cast suspicion upon the contention of the plaintiff. One passingly strange thing about this alleged partnership is that the defendant never knew about it during the time she lived with the deceased for almost a quarter of

a century. The plaintiff himself does not assert that the defendant knew about such an agreement or that he ever discussed it with the defendant while his father lived. Another singular fact is that no one at the bank where the deceased transacted his business, so far as the record shows, ever knew about such partnership. In addition to this, although the deceased remarried and began the operation of a hotel jointly with the second wife, no demand after 1909 was ever made by the plaintiff upon the deceased for a division of the partnership property. It is admitted, however, that the deceased gave the plaintiff a home in Dalhart and permitted him to use some of his personal funds to purchase property in his own name, which property no one asserts ever belonged to the partnership. The plaintiff still owns some of such property and other such property he admits he sold and used the proceeds independently of the partnership. The plaintiff at no time asserts, under the agreement, that he was to be liable for any losses that the alleged partnership might sustain. He asserts only that he was to share equally in the profits therefrom. In this connection, the record shows that the deceased borrowed huge sums of money from the Boyce family upon his own unsecured notes, in which transactions the plaintiff was not a party. Such money was obtained by the deceased upon his own personal responsibility. There are two other things we wish to mention which we think cast some suspicion upon the claims of the plaintiff. One is the account book which was kept by the deceased in his own handwriting from 1902 through 1908. We think this account book speaks by its silence in several respects. It is conceded that the deceased had partnerships with various persons other than the plaintiff, such partnerships being presumably in real estate in Dalhart. This account book recognizes such partnerships as Burnett & Logan, Logan, Woodward & Johnson, and Logan & Fulghum, but in no place in such book is any partnership recognized between the plaintiff and the deceased. In several instances in such book reference is made to certain tenants who "went into my house" on certain dates from 1905 to 1908. In one instance there is a reference which indicates that a tenant by the name of Tom Mansker began the occupancy of a house that belonged to the plaintiff. The notation is as follows: "August 19, 1907, Tom Mansker went into Van's house 12.50." We think the presumption is evident that this tenant was occupying property that was recognized by the bookkeeper as belonging to the plaintiff. It further indicates that the deceased did not recognize the partnership that the plaintiff asserts. The other thing we think is singular in connection with plaintiff's claim is what took place at the time the will was read. At such time the plaintiff made no assertion that he had been a partner with his father and that as a result thereof he owned an undivided one-half interest in all the property of such estate. At this time the plaintiff and the defendant were both present. The wife of the plaintiff was also present and attorneys for each of the litigants. The will was read devising all of the property of the deceased to the defendant. Not one word was said by the plaintiff, his wife, or his attorney that would indicate any partnership had ever existed or that the plaintiff was the owner of an undivided one-half interest in such property. The only claim that the plaintiff made at such time was that his father was supposed to have left him "two deeds." Just what the two deeds were for was not divulged.

The plaintiff depends upon certain isolated statements of his father made to third parties for his corroboration in sustaining the partnership. John Logan, the brother of the plaintiff, visited the deceased and plaintiff about 1911. At this time the deceased pointed out to him certain properties belonging to the deceased and the plaintiff. He did not identify such property. W. A. Ketchum testified that in 1903 or 1904 he heard the deceased say that he had taken the plaintiff in as a partner in "the business." Although he had had many transactions with the deceased, the deceased never consulted the plaintiff. John Bolton testified that in 1904 or 1905 the deceased told him that he had taken the plaintiff in as a partner. He said the deceased pointed out to him several residences on the north side of Dalhart which the deceased stated belonged to him and his son. These properties were not identified by the witness. Bill Johnson, in October, 1902, heard deceased tell the plaintiff that if plaintiff would stay with deceased in Dalhart that the deceased would take him in as a partner, yet the plaintiff says such agreement was made in May, 1902. L. F. Horn, in 1905, heard deceased say that plaintiff had "stuck with him through thick and thin," and that he expected to do everything he could for the plaintiff. He

also heard deceased ask a Capt. Brown in 1908 to encourage the plaintiff to remain in Dalhart, saying, "We couldn't sell our property for as much now as we can later." Just what property was referred to is not revealed. Charles E. Tracey, from 1903 to 1909, heard various conversations between the deceased and the plaintiff in which the deceased said he was putting the plaintiff's money into property. He also remembered many quarrels between them over the plaintiff's wages, although the plaintiff claims that neither he nor his father were due any wages under the partnership agreement. Everett Bates heard deceased say that plaintiff was the only one of his children that had stayed with him and that he was putting plaintiff's salary in partnership business and real estate. The last time this witness ever heard any such remark was in 1914 or 1915, when the deceased stated that he and the plaintiff "had been partners," using the past tense in his quotation. Elizabeth Rowley said that in 1902 or 1903 she heard the deceased remark that he and the plaintiff were partners in certain property, but such property was not identified. Guy Rowley, in 1902, heard deceased talking about property which the deceased and plaintiff owned. The witness was 12 years old at the time. The property was not identified. Geo. R. King did some carpenter work about 1912 or 1913 for the deceased at which time the deceased made some remark about the plaintiff and deceased being partners "on a house or two." At this time the testimony shows that there were many houses in Dalhart in the name of the deceased. This witness worked on several houses for the deceased and no intimation was made to him that the plaintiff had any interest in them. W. H. Lathem, a real estate man at Dalhart, who had many transactions with the deceased, testified that upon several occasions the deceased remarked to him that he would have to see the plaintiff in regard to fixing a price on certain real estate. He did not assert that the deceased intimated to him that any partnership existed and he did not identify the property involved.

The above testimony is all the testimony in the record, aside from that of the plaintiff and his wife, that sheds any light upon the purported partnership. It may be that such testimony would warrant a finding that some sort of a partnership arrangement did exist prior to the second marriage of the deceased, but we think it wholly fails to establish any such partnership, as the plaintiff claims, after said marriage. The isolated statements of the deceased during the period from 1902 until his marriage in 1912, as testified to by the above witnesses, would not establish the fact that during any period the plaintiff was to have an undivided one-half interest in all the property acquired during such period. At best, it would only show some sort of an arrangement between the plaintiff and the deceased whereby the plaintiff might have an interest in some of the property or in some of the business carried on at such time. No one of the above witnesses undertook to quote the deceased as saying that his son was a full partner with him in all of his enterprises or that he did own or should own an undivided one-half interest in and to all of his property.

▮▮▮ It may be that the plaintiff was to have a half interest in some of the property acquired during the period before 1912, and it may be that the plaintiff was a partner in the feeding business with his father, which ceased along about 1906. The testimony is woefully weak to establish these facts, and even by the boldest stretch of the imagination we cannot see how the above testimony would extend such partnership, whatever it was, beyond the second marriage in 1912. We think the testimony is just as cogent to establish the fact that a settlement was made between the alleged partners prior to 1912 and that thereafter no such partnership existed, if it ever did exist. This is particularly true in view of the fact that along about 1910 the two alleged partners engaged in independent occupations for themselves. In order to establish his claim the plaintiff relies wholly upon his own testimony and that of the isolated statements of the deceased made more than a quarter of a century ago to witnesses who could have placed the wrong interpretation upon such statements. Such claim is based entirely upon the isolated statements alleged to have been made by the deceased, whether from the testimony of the plaintiff or from the other witnesses. Even the testimony of the plaintiff himself, tending to show an agreement, is based upon statements of the deceased. In support of his contention, the plaintiff places his own interpretations upon these statements, which interpretations, to say the least, are mere conclusions from a witness who is highly interested in the results of such interpretations. In regard to the

statements of a dead man, who can neither deny or explain such statements, we call attention to 22 C.J. 289, par. 318 and 319, wherein is the following language:

"It is a common experience of those dealing with human testimony that conversations are very imperfectly remembered, particularly where the exact language used is sought to be recalled after a considerable lapse of time, where the words spoken were of indifferent interest to the hearer, so that he would have no occasion to treasure them up in his memory, or where the statement was made in loose, casual, or random conversation. In addition to this, testimony as to the admissions, or other oral statements of a person not called as a witness, is open to the objection that it is easily fabricated, or the statement may have been imperfectly comprehended, wrongly interpreted, or misunderstood by an honest reporting witness. For these reasons such testimony is regarded as weak and even dangerous evidence, which should always be received with caution. * * *

"Exposed to all the infirmities just mentioned and to the further objection that it is impossible, in most cases, to convict the witness of perjury if his testimony is wilfully false, testimony as to the oral statements of deceased persons, * * * is therefore regarded as the weakest kind of evidence and subjected to the closest scrutiny."

 Even though such a partnership at one time existed, as far as the property acquired after the second marriage is concerned, we think the plaintiff has wholly failed to discharge the burden placed upon him in tracing the trust funds by clear and convincing proof into the property against which the trust is sought to be established. It is undisputed that the deceased and the defendant operated the Grand Hotel at Dalhart from the date of their marriage until about 1927. The defendant testified that such enterprise was a thriving business which for several years after the marriage netted profits amounting to as high as $600 per month. During all these years the plaintiff had nothing to do with the operation of this hotel. If such a partnership existed, and the plaintiff owned a one-half interest in the building in which the hotel business was conducted, he could assert a claim to no more than one-half of the reasonable rental upon the building. He surely could not claim a half interest in the profits of the business conducted in such building. He could no more claim a half interest in these profits than he could claim an interest in the profits of some business operated in another alleged partnership building by persons with whom he claimed no business connections. We think the operation of this hotel by the deceased and the defendant was a business just as independent from the alleged partnership as would have been a millinery shop, a dress shop or a drygoods store in the same or another building belonging to the alleged partnership, and we think the plaintiff would be just as devoid of any interest in the profits of the hotel business as he would be of an interest in the profits of any of the other businesses named.

This hotel business proved very successful and netted thousands of dollars each year it was so operated. This fact is uncontroverted and is supported by the testimony of one of the witnesses from the bank where the deceased made his deposits. It is also uncontroverted that the money derived from this hotel business was used in the investments of the deceased in other real estate. It is uncontroverted that the major portion of the property of the estate was acquired after 1912. Except for the hotel building, it is undisputed that all of the brick buildings, which compromise the real value of the estate, were built and paid for after the second marriage. It is, therefore, inescapable that a great portion of the property, in fact most of it, was acquired by the joint efforts of the defendant and her husband in the operation of the hotel. Such profits would constitute the community property of the second marriage.

 Without going into detail about the changes that have been made in article 4613, R.C.S., from 1912 until the death of the deceased, it is sufficient to say that, during two periods of the existence of the community estate of the deceased and the defendant, all of the rents and revenues derived by the deceased from any separate property that he possessed passed into the community estate. All such rents and revenues became community property after 1929 when the Legislature amended said article to read as it now stands. Vernon's Ann.Civ.St. art. 4613. Aside from the rents and revenues derived from any separate property of the deceased or from the asserted partnership property, the profits from the hotel busi-

ness would constitute community property independently of any real property as though no real property had ever been owned by any of the parties to this suit. Such profits would not, in our opinion, be rents or revenues from any real property upon which the plaintiff was asserting a claim, but would be revenues derived from the toil, talent, and industry of the defendant and the deceased. In support of such theory, we quote from 31 C.J. 20, par. 1095, as follows: "In addition to the statutory negative definition of community property, a positive definition approximately correct may also be framed out of the materials of the typical community of the Spanish law, and community property may thus be defined as all property and pecuniary rights obtained by, or in the name of, either spouse after the marriage, by toil, talent, thrift, energy, industry, or other productive faculty, and all the rents, issues, profits, fruits, and revenues of separate property.

 Such being the law, it is incumbent upon the plaintiff to trace his trust funds into the property sought to be charged therewith and separate his trust funds from that of the community estate of the deceased and the defendant with clear and convincing proof. It is evident that, if any partnership trust existed, its funds have been commingled with the community funds. The burden is upon the cestui que trust to separate the two estates. He must follow the proceeds of the alleged partnership through its mutations in the hands of the deceased, and identify the property into which they passed. This may be a burden upon the plaintiff which he cannot overcome, but we think the law has placed upon him such burden.

We think the plaintiff has wholly failed to discharge such burden. This is evident from the answers he made to his counsel in attempting to trace such funds into the various properties. In answer to each question as to how each particular piece of property was acquired by his father, he responded with the same stereotyped statement, "It was purchased out of the income from the estate," or "It was bought out of the income from our property." That such testimony was based on hearsay is inescapable from the record. At most, it constitutes only an opinion and a conclusion of an interested witness. We, therefore, hold that the testimony is insufficient to sustain the judgment of the trial court. 26 R.C.L. 1231, par. 77; 17 Tex.Jur. 922, par. 416; Henry et al. v. Phillips, 105 Tex. 459, 151 S.W. 533; Finley et al. v. Pafford et al., Tex.Civ.App., 104 S.W.2d 163; Schuyler et al. v. Lacy et al., Tex.Civ.App., 79 S.W.2d 901; Elder v. King et al., Tex. Civ.App., 69 S.W.2d 479; Wacasey v. Wacasey et al., Tex.Civ.App., 256 S.W. 1020; Carl et al. v. Settegast et al., Tex.Com. App., 237 S.W. 238; Couch v. Sparger et al., Tex.Civ.App., 252 S.W. 817; Jones et al. v. Siler et al., Tex.Com.App., 100 S.W. 2d 352; Tyler County State Bank et al. v. Shivers, Tex.Com.App., 6 S.W.2d 108; Hand v. Errington et al., Tex.Com.App., 242 S.W. 722.

 In view of another trial of this case, we shall discuss briefly appellant's assignment alleging error in the court's permitting the plaintiff to testify to transactions between him and the deceased. The court limited such testimony in the judgment to the defendant in her capacity as sole legatee under the will. Since the plaintiff was not seeking a recovery as an heir of the deceased and his recovery was limited to the defendant in her capacity as sole legatee under the will, we do not think such testimony was in contravention of article 3716, R.C.S. Spencer et al. v. Schell, 107 Tex. 44, 173 S.W. 867; Harris v. Warlick et al., Tex.Civ.App., 42 S. W. 356; Field v. Field et al., 39 Tex.Civ. App. 1, 87 S.W. 726; Evans et al. v. Scott et al., Tex.Civ.App., 97 S.W. 116.

The judgment of the trial court is reversed, and the cause remanded.