ROBERT P. SLOAN, Administrator of the Estate of JOE R. SLOAN, Deceased v. CAROLINA POWER and LIGHT COMPANY.

(Filed 9 April, 1958)

**1. Electricity § 7:    Evidence § 36—**

The National Electrical Safety Code, which has not been approved by the General Assembly and thus does not have the force of law in this State, is incompetent as evidence, and is properly excluded when offered as proof of safety clearance requirements between a power line and a telephone line.

**2. Trial § 22a—**

On motion to nonsuit, the evidence is to be considered in the light most favorable to plaintiff, and he is entitled to every reasonable inference to be drawn therefrom.

**3. Negligence § 17—**

Negligence is not presumed, but in the absence of evidence to the contrary, it will be presumed that defendant exercised due care.

**4. Electricity § 7—**

In the absence of evidence to the contrary, it will be presumed that defendant electric company maintained proper clearance between its wires and those of a telephone company.

**5. Negligence § 19b(1)—**

Nonsuit is proper where plaintiff does not offer evidence to support his allegations of actionable negligence.

**6. Electricity § 7—    Evidence held insufficient to support allegation that defendant was negligent in failing to maintain proper clearance between telephone line and its power lines.**

Plaintiff's intestate was a member of a crew stringing a new telephone line. The old telephone line ran beneath defendant's power lines. Intestate

was electrocuted while pulling a new wire over the old telephone lines
when one of the old wires came in contact with defendant's energized
wire. The evidence tended to show that the pulling of the new wire over
the old telephone lines would cause the old lines between adjacent poles
to vary several feet in height and "jump up and down." Plaintiff sought
recovery on the theory that defendant was negligent in failing to main-
tain proper clearance between its energized lines and the old telephone
lines. There was no evidence as to the clearance between the lines prior
to the accident, but plaintiff introduced evidence that there was a clear-
ance of only six or nine inches between the lines after the accident, when
the new telephone wire was still hanging over the old telephone lines.
*Held:* Nonsuit was proper, since the evidence as to the clearance after
the accident, particularly in view of the fact that plaintiff's evidence
tended to show that the operation in which intestate was engaged changed
the clearance between the wires, has no probative force as to the clear-
ance prior to the accident.

**7. Evidence § 26—**

While a factual situation proven to exist is assumed to continue in
existence until there is proof to the contrary, ordinarily such presumption
does not run backward, and proof of the existence of a condition at one
time raises no inference that such condition existed prior to that time.

APPEAL by plaintiff from *Pless, J.,* September 16 "A" Term 1957
of MECKLENBURG.

This is a civil action instituted on 22 May 1956 for the alleged
wrongful death of plaintiff's intestate on 18 August 1955.

On the above date the defendant maintained a power line consist-
ing of three wires diagonally across the "Y" intersection of N.C.
Highway No. 742 at its junction with U. S. Highway No. 52, approxi-
mately one and one-half miles north of Wadesboro, North Carolina.
Two of these wires were energized and carried approximately 12,000
volts of electricity; the third wire was a neutral. The neutral wire
was strung 42 inches below the two energized wires on the poles on
either side of the telephone lines hereinafter described. The energized
lines had sagged until the elevation of the power wires above the
surface of the paving at the point of crossing was as follows: the
neutral wire 21 feet 3 inches; one energized wire 21 feet 2 inches; the
other energized wire 21 feet 9 inches. The telephone wires were located
beneath the power wires, but there is no evidence as to their elevation
from the ground or what space existed between them and the power
wires before their position was disturbed by the operation of pulling
the new telephone wire over them, as hereinafter described.

Plaintiff's intestate was an employee and member of the line crew
of the North Carolina Telephone Company. He was 23 years of age
and experienced in line work, having worked two years for Southern
Bell Telephone Company and eighteen days immediately prior to

his death for the North Carolina Telephone Company.

The telephone company was constructing a new line for its own purposes alongside and near the southern margin of N. C. Highway No. 742 at its "Y" junction with U. S. Highway No. 52. Highway No. 52 in the area involved runs in a northwesterly direction from Wadesboro, while Highway No. 742 runs substantially east and west.

On the morning of 18 August 1955, the telephone crew, of which plaintiff's intestate was a member, went to the scene under the supervision of and accompanied by one Comer, as foreman, to string and attach the wires for the new telephone line, which were to replace the old line. Comer, without calling attention to the existence of the nearby power line, or to the condition of the wires crossing each other at that point, or any mention of danger due to the presence of the power line, without any instruction or caution to use conventional protective equipment, merely told the men to put the new wire on the new poles, and immediately left the scene and did not return until after the accident, which occurred between ten and eleven o'clock a.m.

In doing the work, a roll of new wire on a reel was placed near the base of a new telephone pole approximately 70 feet east of the old telephone line. The old line ran along the western side of U. S. Highway No. 52; the new line was to run westwardly on the south side of N. C. Highway No. 742. Plaintiff's intestate and one Lockhart Deese took the wire at the reel and began to pull it along the route the new line was to be constructed. When they reached the old line they tried to throw the new line over the old line but were unable to do so. They then caused another member of the crew to climb a telephone pole in the old line, designated as pole 2-A, which was located 26 feet northwest of the point where the new line was to cross over the old line, and throw the new line over and across the old line which consisted of six wires, two of which ended on a 10-foot cross-arm on the pole; this pole was located 33 feet 10 inches southeast of the point where the power line crossed over the telephone wires. When Deese and plaintiff's intestate, Joe R. Sloan, had pulled the wire a distance of approximately 160 feet, a telephone wire on the old line came in contact with the power line and ran along the old telephone line to the new line and electrocuted Sloan. Deese was knocked unconscious. Sloan had on leather gloves; Deese was barehanded, but Deese was at the end of the line, while Sloan was pulling the line between Deese and the point where the line crossed over the old telephone wires.

Deese testified, " * * * I did not know the power line was * * * out there. If I had I never would have put my hands on that wire to pull it * * * I would have known that by pulling that wire over there would have been a dangerous thing * * * it was liable to cause those wires

to whip together." This witness further testified that he could have seen the power line if he had looked, but that he did not look.

Archie A. Thomas, an employee of the telephone company and who was handling the reel and was knocked down by the current at the time plaintiff's intestate was killed, testified, "I knew the power wires were there. I could not keep from seeing them. They were right out there in the open. There were no trees or any obstructions at all there in the whole area. * * * If we had foreseen after we looked at the wires out there the distance between the power lines and the telephone wires, we would not even have worked on the line. We would not have even touched those telephone lines if we had thought there was any danger in those telephone wires from the distance they were from the power lines coming in contact with the electric wires overhead. * * * Yes, I looked and saw that there was clearance but I did not know how much. If it had looked to me like it would have been dangerous I would not have strung the wire at all. * * * As conditions existed before these wires were pulled across up there, there was no current flowing from the power wire to the telephone wires and to the new telephone wires. If there had been I would have felt it. Whatever caused the electricity to get on it was the result of what those boys were doing pulling that wire."

This witness further testified that it is customary when stringing new wire to take a rope and pull the wire by the rope instead of coming into direct contact with the wire. "I do not know why it was not done in this instance." Ropes were available for that purpose but were not used.

The evidence further tends to show that the cross-arm on the telephone pole between the point where the new line was being pulled over the old telephone line and the power line was 10 feet long and about 20 feet above the ground. The cross-arm was listing or in a cocked position before and after the accident. Five of the six wires on the telephone line were on the westerly side of the cross-arm. The western end of the cross-arm was lower than the other end "by 6 inches or so." The pole was split at the top.

The evidence was in conflict as to whether one could observe from the ground how much space existed between the power line and the telephone wires where they crossed. The testimony was to the effect, however, that after the accident there was a clearance of from 6 to 9 inches between the lines, with the new line still hanging over the old telephone line. Before the telephone crew returned to work on the new line, the old line that passed under the power line was cut down.

The plaintiff introduced the adverse examination of Walter F. Harper, Division Engineer for the defendant, who, among other things,

testified, "This was a primary circuit. We needed a neutral to take care of and conduct any unbalanced ampheres that might be in the line on back to the source. It is necessary to have that sort of neutral to have a power line. It did not make any difference where this neutral was located. I do not know of any practice in my experience either with the Carolina Power & Light Company or with any other electric company where the neutral is positioned on a pole with reference to the primary line as a means of protecting people or things from coming into contact with the wire maintained overhead. I don't know of any such case anywhere. The neutral is never used as a safety means of protection from contact with primary wires. We don't do anything to mark a neutral so that the public would know the neutral from a hot wire. * * * Our company also has other types of lines, transmission lines that carry the neutral on the very top of either the pole line or the steel tower line above the primary conductors. It is a common practice for Duke Power Company to put the neutral on top. I know of nothing in the literature that indicates a neutral wire should be positioned as a guard wire to safeguard people or things that come in contact with energized wires. * * * The question of clearance is in any direction, whether laterally or vertically or swash-wise in any direction."

This witness also testified, "The two primary conductors were on the end or almost on the end of an eight-foot cross-arm which would be * * * about 4 feet from the center of the pole—not quite 4 feet."

The plaintiff's evidence further tends to show that the neutral wire was fastened to the poles about 42 inches below the cross-arms; that wires fastened to cross-arms tend to sag more than wires which are fastened to the poles. Mr. Harper further testified with respect to a question as to what would cause a telephone line to be higher at one time than at another. He said, "It would be high one second and low the next. That would occur, of course, over in the span beyond pole 2-A across the road (this telephone pole was between the point where the wire was being pulled over the old line and the point where the old telephone line passed under the power line). That is the place where it would jump up and down and that may occur two or three spans away jumping up and down three, four or five feet depending on how much slack was in the wire and depending on how these fellows (Deese and Sloan) were pulling it." The evidence is to the further effect that defendant had no notice that a new telephone line was being constructed in this particular area. This witness testified also that there was "nothing to obstruct the view of anybody if they had looked from seeing the exact condition of the power line in the exact

relation to the telephone lines. There was nothing to obstruct the view. It was all out in the wide open." Mr. Harper inspected the power line the next day after the accident, at which time the old telephone line had been cut down.

It was stipulated that plaintiff's intestate, Joe R. Sloan, was an employee of the North Carolina Telephone Company; that both were subject to the North Carolina Workmen's Compensation Act, and that compensation has been paid as provided by law. It was further stipulated that the power line which crossed over the old telephone line at the place in question was constructed after the telephone line was built; that plaintiff's intestate died as a result of electrocution on 18 August 1955.

At the close of plaintiff's evidence the defendant moved for judgment as of nonsuit. The motion was sustained, and from the judgment entered the plaintiff appeals, assigning error.

*Richard M. Welling, Ernest S. DeLaney, Jr., for plaintiff, appellant.*
*Taylor, Kitchin & Taylor, Carswell & Justice, and A. Y. Arledge, for defendant, appellee.*

DENNY, J.   The plaintiff's assignments of error Nos. 1, 2, 3 and 4 are directed to the refusal of the court below to permit plaintiff to introduce in evidence Section 233, Table 3, page 69, of the National Electrical Safety Code, issued 15 August 1949, by the United States Department of Commerce, Bureau of Standards, which the plaintiff contends contains the clearance requirements between a power line carrying 12,000 volts and a telephone line. The defendant did not concede the correctness of the plaintiff's contention and objected to the introduction of the Code as well as the proffered evidence based thereon. These objections were sustained.

In *Lutz Industries v. Dixie Home Stores,* 242 N.C. 332, 88 S.E. 2d 333, Parker, J., in speaking for the Court, pointed out that in the 1954 Cumulative Supplement to 20 Am. Jur., Evidence, page 111 (now in 1957 Cumulative Supplement to 20 Am. Jur., Evidence, page 129), it is written: "With the apparent exception of one jurisdiction (Alabama), safety codes which have been issued by governmental departments or commissions, or promulgated by voluntary associations, for their informative value and not as regulations having the force of law, are not admissible to prove the truth of the statements therein contained."

It was also pointed out in the above opinion that in Anno:—Evidence—Safety Codes, 122 A.L.R. 644, at page 646, it is said: "That the general rule against admission in evidence, in negligence actions, of

safety codes or rules is restricted to codes or rules not having the force of law is shown by decisions in various cases involving safety rules enforceable as laws." *Lutz Industries v. Dixie Home Stores, supra; Mississippi Power & Light Co. v. Whitescarver* (C.C.A. 5th), 68 F 2d 928; *Grant v. Libby, McNeill & Libby,* 160 Wash. 138, 295 P 139; Anno:—Evidence—Safety Codes, 122 A.L.R. 644.

In the case of *Mississippi Power & Light Co. v. Whitescarver, supra,* it was held that the National Electric Safety Code (apparently similar to the Code now under consideration), issued by the United States Department of Commerce, Bureau of Standards, had been properly excluded from evidence in the action to recover from the electric company for the accidental electrocution of the plaintiff's decedent. It had been conceded that the code had no compulsive force—that no law required it—and the Court pointed out that it represented merely the opinion of the compilers, and that "its preface states that as to many matters there are conflicting views and that especially many changes had been made in this edition touching line construction and that there would be future growth and development, and criticism is invited." The Court said: "It thus appears from the book itself what we should have known anyway, that it deals not with an exact science or mathematical or factual certainties, but with a controversial and developing science in which opinions may vary and experience work great changes. Books in such a field are like medical works rather than like almanacs, mathematical tables, approved histories, census compilations or weather reports. They are at last only the expert opinions of the authors, delivered not under oath nor subject to cross-examination, without opportunity to qualify or explain them, and really without certainty that the author still adheres to the opinions expressed when the book was written."

In *Lutz Industries v. Dixie Home Stores, supra,* certain provisions of the National Electrical Code, as approved by the American Standards Association, with respect to the installation of electric wiring in buildings, had been given the force of law by our General Assembly. But, there is nothing in the record before us to indicate that any approval has been given to the National Electrical Safety Code by our General Assembly with respect to the subject under consideration that would give the Code the force of law in this jurisdiction. Hence, the rulings of the court below in excluding the offered section of the National Electrical Safety Code and the proffered evidence based thereon are sustained.

In our opinion, the only additional question raised on this appeal that merits discussion is whether or not the court below committed error in sustaining the defendant's motion for judgment as of nonsuit.

In considering a motion for judgment as of nonsuit, the evidence is to be considered in the light most favorable to the plaintiff and he is entitled to every reasonable inference to be drawn therefrom. *Atkins v. Transportation Co.,* 224 N.C. 688, 32 S.E. 2d 209.

The plaintiff contends that the defendant negligently constructed and maintained its power line; that the defendant allowed its power line, which consisted of two energized wires and a neutral, to cross too close to the telephone lines at the intersection where plaintiff's intestate was killed. There is no evidence whatever tending to show the actual or approximate clearance between the telephone wires and the power wires at the intersecting point before the accident. This would seem to be the crucial defect in the plaintiff's evidence. There is evidence of the distance of separation after the accident, but not before. Ordinarily, without evidence to the contrary, the inference would be that the defendant had provided proper clearance.

As stated in 65 CJS., Negligence, Section 204, page 954, et seq., "Negligence on the part of the defendant, as a general rule, is never presumed but is a matter for affirmative proof. * * * the presumption is in favor of innocence or performance of duty and against the existence of negligence, and in the absence of affirmative proof it will be presumed that defendant or his servants were not guilty of negligence but exercised due care with respect to the thing or condition which caused the accident." *Martin v. United States* (U.S. Court of Appeals, D.C.C.), 225 F 2d 945; *F. W. Woolworth Co. v. Williams* (Court of Appeals, District of Columbia), 41 F 2d 970; *Bush v. Harvey Transfer Co.,* 146 Ohio St. 657, 67 N.E. 2d 851; *Atlantic Coast Line R.R. Co. v. Brown,* 82 Ga.App. 889, 62 S.E. 2d 736; *Yeary v. Holbrook,* 171 Va. 266, 198 S.E. 441.

A nonsuit is proper where the plaintiff does not offer evidence to support his allegations of actionable negligence.

In *Insurance Ass'n. v. Motors, Inc.,* 240 N.C. 183, 81 S.E. 2d 416, Bobbitt, J., in speaking for the Court, said: "Ordinarily, in a negligence case, it is incumbent upon plaintiff to allege and prove facts constituting actionable negligence; and, when the evidence fails to disclose actionable negligence as alleged, nonsuit is proper. Conjecture and surmise will not suffice."

If it be conceded that the power clearance between a 12,000-volt power line and a telephone line is six feet, as contended by the plaintiff, no evidence was offered to substantiate his allegation that a proper clearance did not exist before the employees of the telephone company pulled the new wire over the old telephone wires.

Evidence was introduced tending to show the height of the wires of the defendant power company from the ground after the accident,

and there is-no contention that the contact with the power line changed the position of such wires in any respect. Likewise, evidence was introduced as to the height of the telephone pole located 33 feet 10 inches southeast of the power line and the wires attached to the 10-foot cross-arm. The evidence shows that the next telephone pole to the northwest of the power line was 245 feet, making the telephone poles 278 feet 10 inches apart at the span involved; that the power line poles were 384 feet apart at the power line span involved. However, there is no evidence as to the sag of the power wires in relation to the sag in the telephone wires before the accident. The plaintiff's evidence, except that of Thomas and Harper, hereinabove set out, is unequivocally to the effect that by observing the power and telephone lines from the ground, the distance of the clearance between the power wires and the telephone wires could not be ascertained.

Ordinarily, "where a particular state of things is once proven to exist, it is often said that there is a presumption of continuance in that state without change * * *." Stansbury, North Carolina Evidence, section 237, page 491.

Conceding that a factual situation once proven is presumed to continue in existence unless there is proof to the contrary, the existence of a condition at the time of an accident is not presumed to have existed prior thereto, and particularly when the accident resulted from an operation that the evidence tends to show changed the condition and that such change was the proximate cause of the injury or one of the proximate causes thereof. Any inference or contention that the telephone wires were in the same location or condition before the accident as they were afterwards, must be predicated on evidence of such location or condition prior to the accident. The general rule in this respect is stated in 31 CJS, Evidence, section 140, page 789, as follows: "As a general rule mere proof of the existence of a present condition or state of facts or proof of the existence of a condition or state of facts at a given time, does not raise any presumption that the same condition or facts existed at a prior date, since inferences or presumptions of fact ordinarily do not run backward."

Likewise, in the case of *Liverpool & London & Globe Ins. Co. v. Nebraska Storage Warehouses* (C.C.A. 8th), 96 F 2d 30, it is said: " * * * that while a given condition, shown to exist at a given time, may be presumed to have continued, there is not, on the other hand, any presumption that it existed previous to the time shown."

In our opinion, the evidence on this record is not sufficient to show actionable negligence on the part of the defendant.

We express no opinion on the questions argued in the defendant's brief relating to insulated negligence and contributory negligence.

The judgment of the court below is
Affirmed.