Viola Lee McDONALD

v.

UNITED STATES of America.

C.A. 4–697.

United States District Court
N. D. Texas,
Fort Worth Division.

Dec. 27, 1967.

Order Feb. 26, 1968.

---

T. Gary Cole, Jr., Robert Randolph, Fort Worth, Tex., for plaintiff.

Wm. L. Johnson, Jr., Asst. U. S. Atty., Fort Worth, Tex., for defendant.

## OPINION

BREWSTER, District Judge.

E. L. McDonald, a floor sander, sustained serious burns over a large part of his body in a flash fire and explosion which occurred as he was starting to refinish the floors in a vacant apartment of a Wherry housing project, owned, operated and maintained by the government. He died twelve days later as a result of the burns. Natural gas had escaped into the apartment through an uncapped, unplugged flexible copper tube which had been disconnected from the gas dryer which it served. The gas was ignited by a spark emitted when the electrical sanding machine was started. Fumes from fresh paint on the interior walls and woodwork obscured the odor of the gas.

McDonald, though in his fifties, had never married. He made his home with his mother. He was her only source of support and she was his only dependent. This suit under the Federal Tort Claims Act is brought by her in her individual capacity for damages for loss of pecuniary benefits she reasonably expected to receive from her son, and in her capacity as temporary administratrix of his estate to recover his medical, hospital and funeral expenses and damages for conscious pain and suffering endured by him during the period he lived after the explosion.[1]

1. Mrs. McDonald's suit in her individual capacity was brought under the authority of Art. 4675, a part of Title 77, entitled, "Injuries Resulting in Death", of Vernon's Ann.Tex.Civ. Statutes, which provides:

"Actions for damage arising from death shall be for the sole and exclusive benefit of and may be brought by the surviving husband, wife, children, and parents of the person whose death has been caused or by either of them for the benefit of all. If none of said parties commence such action within three calendar months after the death of the deceased, the executor or administrator of the deceased shall commence and prosecute the action unless requested by all of such parties not to prosecute the same. The amount recovered shall not be liable for the debts of the deceased. Const. Art. 16, sec. 26; Acts 1927, 40th Leg., p. 356, ch. 239, § 2."

The deceased was survived only by his mother, two sisters and a brother.

Mrs. McDonald's action as temporary administratrix of her son's estate for damages alleged to be due him at the time of his death is authorized by Art. 5525, Vernon's Ann.Tex.Civ. Statutes, which reads:

"All causes of action upon which suit has been or may hereafter be brought for personal injuries, or for injuries resulting in death, whether such injuries be to the health or to the reputation, or to the person of the injured party, shall not abate by reason of the death of the person against whom such cause of action shall have accrued, nor by reason of the death of such injured person, but, in the case of the death of either or both, all such causes of action shall survive to and in favor of the heirs and legal representatives and estate of such injured party and against the person, or persons liable for

The plaintiff claims that the flash fire and explosion were proximately caused by the government's negligence in failing to install a separate shutoff valve on the gas dryer feeder line inside the house; in failing to cap the gas dryer feeder line inside the house when the dryer was disconnected from it; in failing to mark the outside main gas shutoff valve which controlled the supply of gas to the apartment in question so that it could be distinguished from an identical value which governed the flow of gas to the other apartment in the duplex; in turning on the gas when it was free to escape into the apartment; in failing to inspect the house to assure that it was safe from gas leaks; and in maintaining the gas dryer feeder line as it existed on the occasion in question in violation of Air Force Regulation 91–6.

The government denies that it was guilty of any negligence which proximately caused the explosion, and insists that the incident was caused by the contributory negligence of E. L. McDonald

The only substantial questions in the case are ones of fact raised by the respective claims above set out.

The building where the explosion occurred was a unit in a housing project originally constructed under the Wherry Act [2] for rental to the enlisted military personnel at nearby Carswell Air Force Base. On the occasion in question and for some considerable time prior thereto, the project was owned by the government, and was operated and maintained by it through the Air Force. It was composed of a number of residential buildings. The unit where the explosion occurred was a single story, two family duplex, frame building, with two apartments divided by a common wall under the same roof structure. The apartments were designated by street addresses as 229 and 231 Dayless St., respectively. The explosion occurred in the apartment at 231.

The Air Force maintained the housing project through its civil engineer organization on the Base. The responsibilities of that organization in connection with gas operation and services are set out in Air Force Regulation 91–6 and its supplements, admitted in evidence as Plaintiff's Ex. "P". The following is quoted from that Regulation:

"1. Command Responsibility. In accordance with AFRs 85–5 and 20–42, command responsibilities carried out by the base civil engineer organization are:

\* \* \* \* \* \*

"b. The construction, operation, inspection, testing, repair, preservation, rehabilitation, alteration, and extension of gas generating plants and storage, transmission, and distribution systems.

\* \* \* \* \* \*

"6. Safety Considerations. (See AFM 32–3 for applicable safety requirements.)

"a. Each base civil engineer organization, through its operators, maintenance force, and fire prevention force, will remain constantly alert to detect and eliminate immediately safety and fire hazards arising from defective gas facilities or faulty operation of gas equipment. Operating instructions and precautions should be posted near gas-fired equipment."

Each unit in the project was supplied with natural gas furnished by the public utility gas company which served Fort Worth. Each apartment had a separate meter. The two meters at the 229–231 Dayless duplex were located next to each other in the yard on the 229 side of the building. There was a cutoff valve located on the line to each apartment near the meter which served it. The meters

such injuries and his or their representatives, and may be instituted and prosecuted as if such person or persons against whom same accrued were alive. Acts 1925, p. 299, 39th Leg., ch. 115,

§ 2; Acts 1927, 40th Leg., p. 356, ch. 239, § 1."

2. Subchapter VIII, Chapter 13, Title 12, U.S.Code.

and valves were identical in all respects. There was no tag or visible indication of any kind identifying which of the two apartments was served by either meter or cutoff valve.[3]

The quarters at 231 Dayless were vacated on July 1, 1966, and those at 229 Dayless on the following July 5th. Shortly after the vacancies occurred, the maintenance authorities at the Base de determined that the apartment at 231 should have its interior walls and woodwork repainted and its floors refinished before being rented again. On July 5th, an Airman 2nd Class, acting under instructions from the proper authorities, shut off the gas in each of the apartments at the outside meters. He also disconnected the gas stove and gas clothes dryer in the 231 apartment so that the workmen could move them around while doing the painting and floor finishing. The conduit to the dryer from the main gas pipe in the house was a piece of flexible copper tubing. It went through a hole in the floor and connected with the rigid gas pipe underneath the house. There was no stopcock on or near the tubing, and it was so made that it could not be capped or plugged.[4] When the dryer was disconnected, the only way the flow of gas through the tubing could be cut off was by turning the outside cutoff valve at the meter to "Off" position.

Air Force personnel, acting within the scope of their authority, inspected the apartments on July 6, 1966, and the outside gas shutoff valves and the petcocks at the gas stove and hot water heaters on the inside. All such valves were found to be in "Off" position. No attention was paid to the open end copper tubing.

Glenn Cone, General Contractor, Inc., had done most of the painting and floor refinishing in the housing project for several years, and it got the job at 231 Dayless on the occasion in question. It did the painting with its own employees, and subcontracted the floor finishing to McDonald. The workmen started the painting on July 7, 1966, and completed it around noon on Friday, July 8th. The windows and doors of the apartment were then closed to let the paint dry; and the place was locked and left in that condition until McDonald opened it on the following Monday morning to refinish the floors. The exact time he arrived there is not shown, but the explosion occurred shortly before 8:30 A.M. There was no living witness to the explosion, so the facts surrounding it and some of the events leading up to it must be determined from the circumstances and the legitimate inferences drawn therefrom.

Generally summarized, the Court finds that the tragedy happened in the following manner: The outside cutoff valve controlling the flow of gas to the 231 apartment was turned to "On" position through mistake some time after the painters closed the apartment about noon Friday, thereby allowing gas to flow through the uncapped and unplugged gas dryer connection into the apartment. The fumes from the fresh paint and enamel in the apartment concealed the odor of the gas, because the closing of all windows and doors of the apartment for over two days immediately following the application of the inside paint and enamel during the hot summer month of July had caused the fumes from such paint and enamel to be so strong that the odor of gas was difficult to detect and identify. McDonald did not realize the presence of the gas in time to avoid the explosion by the exercise of ordinary care for his safety. An electric spark emitted when he started the work on the floors with his electrically operated sanding machine ignited the gas in the room and caused a flash fire and explosion which resulted in the burns on the body of McDonald and his death therefrom.

There was a small patch of sanded area on the floor in the vicinity of the

3. See picture admitted in evidence as Exhibit "B".

4. A picture of this copper tubing, as it existed shortly after the explosion, was admitted as Exhibit "J".

sanding machine. It was in the room where the gas dryer was located, and was about the size that would be made by the starting of the sander. Immediately following the explosion, a small fire was extinguished in the area directly in front of the open end of the copper tubing. That was the only fire damage in the apartment. The extensive damage from the explosion is shown by pictures admitted in evidence.[5] The force of it is evidenced by the fact that it wrecked most of the apartment.

Inspection of the outside shutoff valves on the premises right after the explosion disclosed that the valves to 229 and 231 were both turned to the "On" position. Gas was still escaping through the uncapped tubing; and the gas to each of the apartments was promptly turned off at the meters.

The evidence does not show when or how the outside shutoff valve controlling the flow of gas to the 231 apartment was turned on after it was turned to "Off" on July 8th. The Court is of the opinion that proof of such fact is not necessary to sustain a recovery, because there is no question that it was on at the time of the explosion, and that the government should have reasonably anticipated that the valve might be inadvertently turned on by someone who was legitimately trying to open the flow of gas to the 229 apartment and could not tell which cutoff served which apartment. There were two occasions when that could have happened. One was on July 8th when a new tenant moved into the apartment at 229, and an Airman 2d Class was sent by the proper authorities at the Base to turn on the gas to that apartment at the meter. Another was on July 11th. At the very time of the explosion on that date, an airman from the Base had been in the 229 apartment for an hour trying to correct a problem with the gas stove. The government did not offer as witnesses either of those airmen. There is no evidence to show whether the last one had had to shut off the gas at the meter at any time during his work. There is likewise no evidence as to how the airman who turned on the gas at the 229 apartment on July 8th knew which of the two cutoffs served that apartment. It would not be unreasonable to draw the inference from circumstantial evidence that one of these airmen turned on the gas to the apartment at 231 through mistake.

All of the conditions herein described relating to the physical setup of the gas meters, cutoffs, pipes, tubing, appliances, etc., on the premises in question and the dangers from them were known to the authorities at the Base who had responsibility for maintaining the gas utilities operation and services for more than long enough to allow corrective measures to be taken.[6]

■■ McDonald was a business invitee on the premises on the occasion he

---

5. See Exhibits "C" through "J".

6. Several months before the explosion, memoranda in the office of the civil engineer organization at the Base, admitted in evidence here as Plaintiff's Exhibit "O", contained the following statement relating to the facilities in this Wherry housing project:

"PROBLEM

"Bathwall heater. Tubing connections from underneath floor to appliance. No service cock ahead of appliance * * *."

"Note: Wherry housing units are piped through floor with rigid pipe but do not have shutoff valves ahead of short tubing connection."

"RECOMMENDATION:

"A code should be established requiring rigid pipe and gas cock thru floor, then flexible tubing connection to appliance. *This would allow for safety in accomplishing repairs.* At present time gas service to house has to be shut-off to repair or lubricate valves. We will work out a permissible plan for this work to be accomplished along with a general inspection of all equipment in Wherry." (Emphasis added)

While these statements related to bathwall heaters, the same principles applied to flexible tubing connections to other gas appliances. There can be no reason why safety required flexible tubing connections be connected to a rigid pipe coming up through the floor and that such pipe have a gas cock on it only where such tubing served heaters in bath rooms.

was injured. The government owed the duty to take such precautions as an ordinarily prudent person would have taken to protect him from dangers that were latent and not open and obvious. Halepeska v. Callihan Interests, Inc., Tex.S. Ct., 371 S.W.2d 368 (1963). The preponderance of the evidence shows that McDonald was injured as a proximate result of encountering a condition on the premises at 231 Dayless involving unreasonable risk of harm, and that the government owed invitees such as him each of the following duties:

(1) It should have had a stopcock on a pipe inside the house ahead of the flexible copper tubing. This could have been easily and economically done by bringing the gas from the main pipe through the floor into the room with a piece of rigid pipe having a stopcock on it at about the place it connected with the flexible tubing.

(2) It should have had some character of identification on the outside shutoff valves on the premises in question to show which of the two apartments each valve served.

The failure to meet each such duty was negligence; and each such negligent omission, separately and concurrently, was a proximate cause of McDonald's injuries and death.

The findings of negligence are made on the basis of evidence other than the safety codes offered by the plaintiff. Since this trial was without a jury, the Court followed the generally recognized practice of admitting all evidence and then sifting the admissible from the inadmissible after the close of the case. It would be impractical in most non-jury trials to detail the results of such reconsideration, but the Court deems it advisable to do so in the case of evidence as important as the safety codes in this case. The plaintiffs offered in evidence portions of the Plumbing [7] Code of the City of Fort Worth and of the National Fire Code of the National Fire Protective Association.[8] There was no objection by the government to the admission of either one of them. The City Code has the effect of law,[9] but the Court is not convinced that it was ever established that the premises involved were located within the corporate limits of that City. The National Fire Code is disregarded out of precaution on account of the unsettled state of the authorities on the admissibility of such codes and the effect to be given them in this character of case.[10]

7. The two pages offered from the City Plumbing Code are identified as Plaintiff's Exhibits "AA" and "BB", respectively. Portions of the Code urged by the plaintiff required that all outlets not connected to fixtures be capped; that a stopcock be installed in the gas line serving appliances, at the time of the installation of the appliance, in an accessible place within two feet of, and in the same room as, the appliance itself.

That recognition was given, however, to this City Code is shown by the following statement on the second page of the memoranda of the Base civil engineering organization, admitted as Exhibit "O": " * * * (*Local code* requires use of iron body brass core service cocks. —Shop function—no big hazard.)" The City Code in question was the only possible "local code."

8. The three pages offered from the National Fire Code are identified as Plaintiff's Exhibits "CC", "DD" and "EE", respectively. The following is quoted therefrom:

" * * * Likewise, when an appliance is disconnected from an outlet and the outlet is not to be used again immediately, it shall be securely closed gastight * * *."

" * * * It is recommended that they (main gas shutoff valves) be plainly marked with a metal tag attached by the installing agency to that the gas piping systems supplied through them can be readily identified * * *."

"3-5-2. APPLIANCE SHUTOFF VALVES: Any appliance connected to a piping system supplying two or more appliances should have an accessible manual shutoff valve installed upstream of the union or connector and within 6 feet of the appliance it serves."

9. No research has been made as to the binding effect of such a code on land owned by the government within a city.

10. See Annotation: Admissibility in evidence, on issue of negligence, of codes or standards of safety issued or sponsored by governmental body or by voluntary as-

All of the other evidence showed that the exercise of ordinary care under the circumstances required the government to take the precautions above mentioned. Reasonable precautions for safety of persons rightfully on the premises should have been the first order of business.[11]

The government was not in position to make much contest of the facts which established its negligence. The answers it had to make to the requests for admissions show that it was hard put to deny fault on its part. There was no justification for its permitting the conditions in question to exist. It seeks to defeat recovery primarily on the basis of a statement McDonald made to Col. McKeen, a doctor at the Base hospital where McDonald was first taken shortly after he was burned. For purposes of medical background, Col. McKeen sought to find out if gas was involved in the explosion. If it was, there was more likelihood that the fire reached McDonald's respiratory organs.[12] In answer to a question as to whether he smelled gas before the explosion, McDonald replied that he did. The government contends that on the basis of this statement the Court should find that McDonald was guilty of contributory negligence. McDonald's condition and the circumstances under which the statement was made were such that the Court feels that very little weight, if any, should be given the statement in judging McDonald's conduct just prior to the explosion. Second and third degree burns covered almost all of his body above his belt line, as well as his head and arms. He was in a state of shock and was suffering intensely. He had been given a narcotic shortly after reaching the hospital. He could not have been thinking of giving his full side of the matter from the standpoint of legal fault. He was in no condition to reflect. The government would be outraged, and rightly so, if a statement given by an habitual criminal made under similar circumstances were offered against him on his trial for some heinous crime. It ought to show the same solicitude for the rights of a law-abiding man who was willing to work for what he got. Courts have generally been very skeptical of statements made by injured parties

sociation. 75 A.L.R.2d 778, and 6 A.L.R. 2d Later Case Service, p. 136.

See also Boone v. New Orleans Public Service, Inc., La.App., 109 So.2d 800.

The Court is really of the opinion that this Code is properly before it. It is one of the codes listed in the following quotation from Air Force Regulation 91–6, admitted in evidence as Plaintiff's Exhibit "P":

"8. *Bibliography*. The following publications, which may be consulted in most base libraries, are recommended as standard guides to the operation and maintenance of manufactured, natural, or liquefied petroleum gas systems, equipment, and appurtenances. (Note: Items a through d may also be requisitioned through publications distribution channels.)"

"h. National Fire Protection Association, National Fire Codes, Volume 1, Flammable Liquids, Gases, Chemicals, and Explosives. (May also be obtained from National Fire Protection Association International, 60 Batterymarch, Boston 10, Massachusetts.)"

11. It might well be that the civil engineer organization at the Base took the same attitude toward correcting these defects in the gas system as it did in connection with some other gas safety problems in the housing for military personnel there. The following is quoted from page 8 of the memoranda of that office admitted in evidence as Plaintiff's Exhibit "O":

"PROBLEM:

"Floor furnace (Lennox) in Living Room is 27,500 BTU/HR capacity and only means of heating lower floor. Many occupants utilize oven and top burners of ranges to boost temperature within lower floor area. During extreme cold weather, or when outside temperature is below 20° F, the furnace burns continually. Several occupants have stated that the heat exchangers get so hot that they glow in the dark. Extensive heat generation has caused wood to char around outer housing of furnace on several of the units.

"ACTION TAKEN:

"*Pray and hope for the best.*" (Emphasis added).

12. There were no burns to McDonald's respiratory organs. The fact that a victim is exhaling instead of inhaling at the time of a gas fire and explosion will in some instances account for the lack of such burns.

while in a state of shock or suffering or while under the influence of narcotics.[13] That is particularly true where the defendant dies without having an opportunity to explain his statement. There are too many possible explanations consistent with the exercise of ordinary care on McDonald's part for this statement to be taken as any proof of contributory neligence. Among them are that he recognized the smell of gas too late to prevent the accident, or that the explosion itself convinced him that the odor of gas was intermixed with the paint fumes.

McDonald was a mature, dependable workman. It would be unreasonable to believe that he would have even remained in the room if he had known and realized that it was filled with natural gas. The danger here was latent rather than open and obvious; and, under all of the circumstances, it could not have been discovered by McDonald in the exercise of ordinary care. He did not know and appreciate the danger in time to avoid the explosion. Neither was he in possession of facts from which he would be legally charged with such knowledge and appreciation. He was not guilty of contributory neligence, and did not voluntarily expose himself to a known and appreciated danger.

McDonald was 56 years old at the time he was injured. As a self-employed floor sander, his earnings had averaged around $200.00 a month over a period of several years. His mother was 71 years old at the time of his death, and had a life expectancy of 10.38 years. McDonald made his home with her and furnished her entire support. He would have continued to do so for the remainder of her life. The present cash value as of the date of McDonald's death, of the pecuniary benefits his mother could have reasonably expected from him if he had lived was $10,000.00.

The hospital at Carswell Air Force Base was the one nearest the place where McDonald sustained his injuries. He

13. "The law is well settled that an admission or declaration against interest is merely another piece of evidence; it is not conclusive on the party against whom it is offered, and the probative value of it is a question of fact for the jury. The deceased was suffering greatly at the time he made the statement, and it was not shown that he knew the exact conditions under which the accident occurred. The statement that it was not the fault of the driver was apparently meant to convey the idea that if Gage had not tried to board the truck while it was running, he would not have been hurt. In similar cases the courts have held that the jury and not the deceased are called upon to pass upon the question of negligence where an injury had occurred which later resulted in the death of the injured party. * * * and in the case of Logan v. Logan, Tex.Civ.App., 112 S.W.2d 515, the statement is made that the testimony of a witness concerning the oral statement of a deceased person is the weakest kind of evidence and subject to closest scrutiny." McMillan v. Gage, Tex.Civ.App., 165 S.W.2d 754, 755, error refused, want of merit.

The Supreme Court of Nevada, in Los Angeles & S. L. R. Co. v. Lytle, 56 Nev. 192, 52 P.2d 464, 466, in an opinion by Chief Justice Ducker, had this to say of a statement made by a seriously injured person shortly after his accident:

" * * * We did not lose sight of the fact that it was testified to that the driver, shortly after the crash, was heard to say that he must have been asleep. The district court doubtless rejected that statement, and with reason. The injured man was desperately hurt; he was practically unconscious from the time of the crash until he was removed from the scene and taken to the hospital, or at least reduced to such a state, by suffering induced by pain and shock, that his mind was clouded. This condition was attested by witnesses. Statements made under such circumstances are of no value as evidence. Concerning a confession of carelessness by an injured person during the period of shock, this court said in Jones v. West End Consol. Min. Co., 36 Nev. 149, 154, 134 P. 104, 106: 'That he said something to this effect is undisputed even by himself; he simply says that he has no recollection of it or any distinct recollection of anything else during a certain period just after his fall. That his remark was within the period of shock is admitted. * * * It meant nothing. It was the irrational talk of a man in a semiconscious condition, in agony, depending for help upon those about him.' "

was taken there first, and was then transferred to All Saints Hospital in Forth Worth, where Dr. Gracia, a specialist in treating burns, waited on him. Dr. Gracia testified that the burns were so severe that he realized when he first saw McDonald that there was no chance of recovery. The upper portion of his body was cooked. McDonald was conscious until about the last day and a half of the twelve days he lived after the explosion. He suffered excruciating pain until he lost consciousness. Due to the fact that he was burned on all sides of his body, it was impossible for him to lie in a position where his burns were not irritated from friction with the bedding. After the first few hours, he suffered the anguish of knowing that he could not live. A fair cash value for his conscious pain and suffering is $35,000.00.

The following expenses were incurred as a result of his injuries:

| Carswell Air Force Base | |
|---|---|
| Hospital | $   45.00 |
| All Saints Hospital | 1,345.00 |
| Anesthetist | 25.00 |
| Dr. Valentin Gracia | 500.00 |
| Burial Expenses | 750.00 |
| Total | $2,665.00 |

The services for which such charges were made were necessary as a result of McDonald's burns, and the charges were reasonable at the times and places where they were incurred.

The plaintiff is entitled to recover from the defendant $10,000.00 in her individual capacity and $37,665.00 in her capacity as temporary administratrix of McDonald's estate. Judgment will be entered accordingly.

This opinion will serve as findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

## ORDER OVERRULING DEFENDANT'S MOTION FOR RECONSIDERATION AND IN THE ALTERNATIVE MOTION FOR A NEW TRIAL

The government has filed and presented a motion for reconsideration of the amount of damages awarded for conscious pain and suffering and in the alternative for a new trial.

The motion asserts that the amount awarded for conscious pain and suffering "is not a fair cash value for conscious pain and suffering but excessive considering decedent's prior income along with the modern pain relieving techniques in use today." This contention is just about as ridiculous as the government's attitude throughout toward dangers from the gas system in its Wherry housing project, as that attitude is evidenced by the quotation in footnote 11 of the opinion from a memorandum filed in connection with an inspection which revealed that heat resulting from defective heat exchangers in some of the floor furnaces was so excessive that it was causing "wood to char around the outer housing of furnaces on several of the units," and that the "ACTION TAKEN" was, "Pray and hope for the best." It is difficult to understand how any one can argue that the extent of a human's physical suffering and mental anguish from injuries must be measured by the extent to which he is in the red or in the black. The entire upper portion of McDonald's body was cooked as a result of the rank negligence of the government in not providing just the basic techniques of safety in the natural gas system in the houses it was renting to the military personnel on its Air Force Base. A person could hardly have suffered greater torture from physical pain and mental anguish than this poor man did. His financial condition had nothing to do with the extent of his suffering or the value to be put on it. The Court seriously considered the amount to be awarded for pain and suffering before judgment was entered, and concluded that $35,000.00 was more than reasonable to the government. Nothing has come to the Court's attention since that time to create the belief that such amount ought to be lowered. If the Court were going to change the amount, it would be raised—and raised considerably.

The defendant also challeges the sufficiency of the evidence to support the Court's findings in regard to some of the conditions existing at the time of the tragedy. It is true that there was no direct evidence as to some of those matters; but the Court, as the trier of facts, is not limited to mere parroting of evidence in making its findings. It is the power and the duty of the Court to draw reasonable inferences from the evidence, and that was done in this case. The proof of some of the matters involved depended upon circumstantial evidence. The inferences drawn from the evidence, direct and circumstantial, are reasonable and justified. Almost any trier of facts with intelligence above that of an oyster would have reached the same conclusions.

It is therefore ordered that the defendant's motion for reconsideration and in the alternative for a new trial be and it is hereby overruled.