**Thomas QUINN and the First National Bank In Little Rock, Arkansas, Guardian of the Estate of Susan Quinn, a Minor, Plaintiffs,**

v.

**UNITED STATES of America and J. T. Crumley, Defendants.**

**No. LR–68–C–177.**

United States District Court,
E. D. Arkansas, W. D.

May 14, 1970.

---

William H. Sutton, Smith, Williams, Friday & Bowen, Little Rock, Ark., for plaintiffs.

W. H. Dillahunty, U. S. Atty., and Clint Huey, Special Asst. U. S. Atty., Little Rock, Ark., for the United States.

Jacob Sharp, Jr., Cockrill, Laser, McGehee, Sharp & Boswell, Little Rock, Ark., for J. T. Crumley.

OPINION

JOHN E. MILLER, Senior District Judge.

This is an action by which plaintiffs seek damages from the defendants J. T.

Crumley and the United States of America resulting from injuries sustained by Susan Quinn, a minor, on July 12, 1968, when the pickup camper in which she was sleeping was struck by a converted school bus driven by the defendant Crumley in the Van Buren Public Use Area, adjacent to Greer's Ferry Lake in north-central Arkansas.

Plaintiffs allege that Crumley was negligent in failing to keep his vehicle under proper control, failing to keep a proper lookout, and in operating the vehicle at a speed unreasonable under the circumstances and without proper brakes.

It is alleged that the agents and servants of the United States were negligent in erecting a barricade without adequately warning the foreseeable motoring public of the danger created by said barricade, in constructing the road in question at such a steep grade as to make it unsafe for travel, in failing to provide guardrails or other safeguards on the road to protect the general public, and in failing to use signing devices designated in criteria adopted by the Corps of Engineers for the construction of civil works projects.

The defendant Crumley denies any negligence on his part proximately causing plaintiffs' damages.

The United States denies any negligence on the part of its agents and servants proximately causing plaintiffs' damages and affirmatively pleads that Susan Quinn assumed the risk of her injuries and damages.

The case was tried to the court without a jury on March 5, 1970.

The following shall constitute the findings of fact and conclusions of law of the court, as contemplated by Rule 52(a), Fed.R.Civ.P.

The court has jurisdiction by virtue of 28 U.S.C. § 1346(b) and because of diversity of citizenship and the amount in controversy. The substantive law of Arkansas controls the questions of negligence herein and the nature and extent of any recovery. Munson v. United States, (6 Cir. 1967) 380 F.2d 976.

On the morning of July 12, 1968, J. T. Crumley, who sold fishing tackle and supplies from a converted 1960 1½ ton school bus, began his normal sales route in the area of Van Buren County, Arkansas. After making one stop at a service station, Crumley drove toward the Van Buren Public Use Area, intending to deliver merchandise to the Fairfield Bay marina. In order to reach the boat dock from State Highway 330, Crumley turned onto an asphalt public road, constructed and maintained by the Corps of Engineers, known as Fairfield Bay Road, which runs over two rather steep hills and leads directly into the camping and picnic areas and to the marina. Crumley had no difficulty in driving over the first hill, but when he approached the crest of the second hill, he shifted down into third gear, then as he reached the crest and began the downgrade, he applied his brakes sharply and attempted to shift down into second gear. The brakes on his bus briefly held and then failed completely and Crumley was unable to complete the shift from neutral into second gear. The bus continued on down the hill over 700 feet from the crest, then left the highway, veering to the left of a barricade in the middle of the road, hit a small embankment, crossed the road again to the right and traveled several hundred feet farther, entering the picnic area and striking the pickup camper in which Susan Quinn and three other persons were sleeping. The camper was parked off the road to the right on a level gravel area. Susan suffered tragic injuries, and another occupant of the camper was killed. Crumley maintained that he had no recollection of the events that transpired after he attempted to gear down the second time.

Approximately one week before the accident, Crumley had experienced total brake failure in the course of his route. Upon examination by a service station attendant, it was determined that the right rear brake cylinder was defective. Additional brake fluid was then added and the fluid line to the defective cylin-

der was pinched off or closed at the direction of Crumley in order to prevent further fluid leakage and allow the remaining three brake cylinders to function properly. Crumley operated the bus in this fashion over his normal route without incident until the accident occurred.

The defendant J. T. Crumley was unquestionably guilty of negligence which was a proximate cause of Susan Quinn's injuries and damages and Thomas Quinn's damages. It has been consistently held in Arkansas that brake failure, without more, is evidence of negligence. Pitts v. Greene, Adm'r, (1964) 238 Ark. 438, 382 S.W.2d 904; Brand v. Rorke, (1955) 225 Ark. 309, 280 S.W.2d 906; Ark.Stat.Ann. § 75–724 (Supp.1967). Here, however, Crumley was well aware of prior difficulty with his brakes and had taken remedial steps that were clearly inadequate. Moreover, he had driven over the road in question to the Fairfield Bay marina at least once a week for six weeks prior to the accident and was well aware of the steepness of the grade. In addition, on the morning of the accident, Crumley's bus was loaded with approximately six thousand dollars worth of fishing tackle, which added considerably to the vehicle's weight. Under these circumstances, he was guilty of negligence in driving the bus with defective brakes on the morning of the accident.

The court is confronted with a more difficult problem regarding the question of negligence on the part of the agents and servants of the United States. Plaintiffs offered in evidence regulations of the Corps of Engineers numbered EM 1130–2–312 and ER 1130–2–312, which set forth criteria for the design and construction of civil works projects. The latter regulation adopts by reference the Manual on Uniform Traffic Control Devices for Streets and Highways, published by the Department of Commerce, and concurred in by the Federal Highway Administrator.[1] Each document was admitted in evidence over the objection of the United States that each was immaterial in the present action.

ER 1130–2–312, which was issued on November 30, 1967, and was in effect at the time of the accident, advises a 10 percent maximum grade for "access" roads,[2] and it seems clear that the road in question leading from State Highway 330 into the camping and picnic areas is an access road. Beginning at the crest of the hill from which Crumley descended into the picnic area, the road grade is 13.25 percent for approximately 800 feet, followed by a grade of 11.19 percent for approximately 500 feet. The barricade in the road was located some 700 to 750 feet from the crest, but it could only be seen for 500 feet due to a curve in the road. While the excessive steepness of the grade undoubtedly rendered the road less safe for use by the traveling public and constituted a hazard to those using the recreation areas, the Government could have discharged its duty to those using the facilities by adequately warning of the danger. Susan Quinn was an invitee upon the premises of the United States constituting the Van Buren Public Use Area, and it is well settled in Arkansas that an owner of premises is required to

---

1. 23 U.S.C. § 109(d) provides that: "On any highway project in which Federal funds hereafter participate, or on any such project constructed since December 20, 1944, the location, form and character of informational, regulatory and warning signs, curb and pavement or other markings, and traffic signals installed or placed by any public authority or other agency, shall be subject to the approval of the State highway department with the concurrence of the Secretary, who is directed to concur only in such installations as will promote the safe and efficient utilization of the highways."

2. Access roads are defined in ER 1130–2–312 at page 5 as: " * * * those which lead vehicles to a specific development area, or within the area to a ramp for boat access to water, or to an activity area or group of such areas having intensive use potentials."

exercise ordinary care to keep the premises reasonably safe for all invitees. Little Rock Land Co. v. Raper, (1968) 245 Ark. 641, 433 S.W.2d 836; Davis v. Safeway Stores, Inc., (1937) 195 Ark. 23, 110 S.W.2d 695. Premises that are "reasonably safe" do not contain hazardous conditions or obstructions, but an owner of premises may avoid liability by providing timely notice of latent dangerous conditions of which he is, or reasonably should be, aware. Dixon v. United States, (8 Cir. 1961) 296 F.2d 556; St. Louis, I. M. & S. Ry. Co. v. Dooley, (1906) 77 Ark. 561, 92 S.W. 789. It should be abundantly clear that a road grade which declines suddenly and steeply over several hundred feet and leads directly into a public picnic area is a latent dangerous condition, at least to one unfamiliar with the area. A sudden decline may well become open and obvious only after it is too late to effectively compensate for the danger.

Regulation ER 1130–2–312, Appendix I, provides at page 16 regarding vehicular traffic control that markers and signs are:

"To conform with 'Manual on Uniform Traffic Control Devices' U. S. Standards Assoc. D6 (U. S. Department of Commerce, Bureau of Public Roads) and other accepted highway standards *and* to include guidelines that follow. *Maximum use shall be made* of all applicable standard highway traffic control signs (color, shape, format and size) to inform the public of maximum safe speed, curve, hill, * * * road ends ahead, closed roads, dead end road, * * * barricades, etc." (Emphasis supplied.)

"Maximum *safe* speed signs ('Maximum Safe Speed_____ MPH') based on road conditions and potential hazards *shall* be used in lieu of *speed limit* signs.

"Maximum safe speed shall not exceed 20 miles per hour *within* an improved public recreation area. Maximum safe speed of not over 30 miles per hour may be used on a primary access road between the entrance and the improved public recreation area *when conditions warrant.*" (Corps of Engineers' emphasis.)

The road below the picnic area and near the boat dock had been inundated since May 12, 1968, and the United States thereafter attempted to divert traffic by placing a wooden horse barricade in the road several hundred feet before reaching the water and at a point where it was possible to turn left and reach the marina from another direction. A stop sign and a yellow sign with an arrow pointing left were attached to the barricade.

The Manual on Uniform Traffic Control Devices provides at page 51 that:

"The ROAD CLOSED sign *shall* be used to mark roads that have been closed to all traffic (except the contractor's equipment and other authorized vehicles) either because of construction or maintenance operations or because of a temporary emergency *such as high water* or a landslide.

* * * * * *

"Where the sign faces through traffic, it *shall* be preceded by an Advance Road Closed warning sign * * * and, if applicable, an Advance Detour warning sign * * *." (Emphasis added.)

The following is found at page 285 of the Manual:

"A barricade should *never* be placed in the line of traffic without advance warning devices." (Emphasis supplied.)

It is specifically provided in the Manual at pages 276–277 that Advance Road Closed warning signs and Advance Detour warning signs should be spaced 1500 feet, 1000 feet and 500 feet from the actual barricade and/or detour.

In addition, the Manual provides at pages 65–66 that:

"The Hill sign * * * *shall* be used in advance of that part of a downgrade where the length, percent of grade, horizontal curvature, or com-

bination thereof, is such as to require special precautions on the part of drivers of any or all vehicles.

"The Hill sign *shall* be used in advance of downgrades of 6 percent or more for lengths given in the following table, or grades of 6 percent or more where any part of the grade is on a curve sharper than 4 degrees. Generally, a Hill sign is warranted on descending grades under the following conditions:

"On a 6-percent grade more than 2,000 feet long;

on a 7-percent grade more than 1,000 feet long;

on an 8-percent grade more than 750 feet long;

on a 9-percent grade more than 500 feet long;

on an 11-percent grade more than 400 feet long;

on a 13-percent grade more than 300 feet long;

on a 15-percent grade more than 200 feet long;

on a grade of 16 percent or more, of any length." (Emphasis supplied.)

The Manual would thus require the placing of a Hill warning sign in advance of the crest of the hill in question. It is undisputed that, in spite of its own regulations, the Corps of Engineers failed to take a single precautionary measure to inform those using the access road of maximum safe speed, the existence of a hill with a sharply descending grade or of the barricade closing the road above the picnic grounds.

■ The effect, if any, to be given the regulations promulgated by the Corps of Engineers in determining the issue of negligence on the part of the United States is a question not easily resolved. It cannot be doubted that Susan Quinn, as a lawful user of the Van Buren Public Use Area, was a person for whose benefit the regulations were drafted, and it is equally clear that the harm which resulted from violating the regulations was of the type they were de-signed to prevent. They bear a reasonable and logical connection to the negligence here alleged and are both relevant and material. In addition, the consistent use of the commanding verb "shall" as opposed to the permissive "may" indicates to the court an intent on the part of the Corps of Engineers that the regulations should be binding.

The regulations do not, however, possess the force of law, and their violation cannot be deemed evidence of negligence. Cf. Bussell v. Missouri Pacific R. R. Co., (1964) 237 Ark. 812, 376 S.W.2d 545; Ratton v. Busby, (1959) 230 Ark. 667, 326 S.W.2d 889. In addition, a few jurisdictions have held that evidence of safety codes issued by governmental bodies which do not possess the force of law is inadmissible hearsay for the reason that the opinion of the authors is not given under oath with an opportunity for cross-examination and that the opinions of the authors themselves may have changed since the code was written. Mississippi Power & Light Co. v. Whitescarver, (5 Cir. 1934) 68 F.2d 928; Sloan v. Carolina Power & Light Co., (1958) 248 N.C. 125, 102 S.E.2d 822; McDonald v. United States, (N.D.Tex. 1968) 284 F.Supp. 978. See generally Anno., 75 A.L.R.2d 778.

■ The court will therefore treat ER 1130–2–312 and the applicable provisions of the Manual on Uniform Traffic Control Devices as neither an absolute standard nor as scientific truth, but will consider the regulations as illustrative and explanatory material along with other evidence in the case bearing on the question of ordinary care. This conclusion is strengthened by the fact that plaintiffs presented expert testimony identifying the Manual as a treatise esteemed by experts in the field.

■■ The court holds that in the exercise of ordinary care, the United States should have erected and maintained signs or other warning devices adequate to inform the public of the existence of the hill in question with its sharply descending grade, the maximum

safe speed to be used in descending the hill, and the existence and location of the barricade. In constructing and maintaining the access road, the United States should have been aware that heavy vehicles, such as campers, automobiles towing boats and trailers, and delivery vehicles carrying gasoline and supplies would inevitably travel over the hill leading into the recreation areas. In fact, prior to the accident, a 2-ton gasoline truck with its brakes in good condition was descending the hill when the brakes became overheated and the driver was unable to stop the vehicle before it entered the inundated portion of the road below the picnic area. The risk of brake failure and the attendant danger to those using the recreation areas was clearly sufficient to warrant the use of simple warning signs. The danger was made especially acute by virtue of the fact that the public picnic area, which was not protected by guardrails or other warning devices, was located to the right of and adjacent to the lower portion of the hill. Even in the case of those who had driven over the access road sufficiently to familiarize themselves with its features, it must be remembered that the duty to warn of danger runs not only to the careful individual, but also to one whose momentary inattention and carelessness may, if not alerted, victimize the innocent. United States v. State of Washington, (9 Cir. 1965) 351 F.2d 913. Even those individuals who are aware of the general location of dangers may, unless reminded, be taken by surprise.

 Nor can it be successfully contended that Susan Quinn assumed the risk of her injuries and damages. The doctrine of assumption of risk is not favored by the Arkansas Supreme Court, Spradlin v. Klump, (1968) 244 Ark. 841, 427 S.W.2d 542, and involves both knowledge and appreciation of the hazard on the part of the person injured, Mercury Mining Co. v. Chambers, (1937) 193 Ark. 771, 102 S.W.2d 543; Carroll v. Lanza, (E.D.Ark.1953) 116 F.Supp. 491, affirmed in part and re-

versed in part, Lanza v. Carroll, (8 Cir. 1954) 216 F.2d 808, reversed (1955) 349 U.S. 408, 75 S.Ct. 804, 99 L.Ed. 1183, and can only be applied in cases where the person may reasonably elect whether he shall expose himself to it. Chicago, R. I. & P. Ry. Co. v. Lewis, (1912) 103 Ark. 99, 145 S.W. 898. It is necessary that the defense of assumption of risk be proved by a preponderance of the evidence, Sun Oil Co. v. Hedge, (1927) 173 Ark. 729, 293 S.W. 9, and knowledge and understanding of the danger on the part of Susan Quinn has clearly not been established. It is quite true that the absence of warning signs was open and obvious, but a subjective appreciation of the possible consequences does not logically follow. At the time of the accident, Susan was fifteen years of age, and while her immaturity is only one circumstance that must be taken into consideration, it would be unreasonable to presume that one not old enough to obtain an unrestricted driver's license has a working knowledge of the intricacies and dangers of driving a heavy vehicle over steep terrain. There is no evidence nor any reason to suspect that Susan was aware that a heavy vehicle had previously lost control on the same hill. Moreover, the issue is not whether Susan should in the exercise of ordinary care have known of the danger and appreciated the risk of injury, but whether she *in fact* knew of it and realized the possible consequences. Walther v. Cooley, (1955) 224 Ark. 1027, 279 S.W.2d 288. It should be added that Susan was not in a position whereby she might reasonably elect whether to expose herself to the danger, as she was the guest and in the care of Floyd Chesney and his family at the time of the accident and was sleeping at a site chosen by Mr. Chesney. The law will not create a Hobson's choice for a fifteen-year-old girl in unfamiliar surroundings.

Nor is there an issue as to contributory negligence. A reasonably careful person in the position of Susan Quinn would have behaved exactly as she behaved. Any error in judgment on the

part of Floyd Chesney does not affect that conclusion, as there is absolutely no evidence of joint enterprise in the record.

■ Negligence and proximate cause are, of course, separate and distinct issues, Bull v. Manning, (1968) 245 Ark. 552, 433 S.W.2d 145, and the court is led with some ambivalence to the conclusion that the negligence on the part of the United States was not a proximate cause of plaintiffs' injuries and damages. Proximate cause is defined in Arkansas as " * * * a cause which, in a natural and continuous sequence, produces damage and without which the damage would not have occurred," Arkansas Model Instructions 501; Bull v. Manning, supra; Collier v. Citizens Coach Co., (1959) 231 Ark. 489, 330 S.W.2d 74. As herein stated, Crumley had, prior to the accident, driven over the road in question at least once a week for six weeks. He was quite familiar with the terrain and was aware of the presence of the barricade. Most important, the circumstances of the brake failure and his descent into the picnic area make it clear that the presence of adequate warning signs would not have prevented this tragic accident. The motor on Crumley's bus was "missing" on the morning of the accident and the vehicle was traveling at a rate of 10–15 miles per hour as it crested the hill. Crumley was thus driving at a reasonable and safe speed under normal conditions and was well within the maximum safe speed of 20 miles per hour advised by ER 1130–2–312. Crumley did not need to be reminded of the existence of the hill and the presence of the barricade, as he consistently stated that he geared down once before reaching the crest of the hill and applied his brakes and attempted to gear down a second time just as he reached the crest. It may be reasonably inferred that, had Crumley's bus been equipped with adequate brakes, he could have completed his timely attempt to shift down at a speed of 10–15 miles per hour. Crumley's error was in driving a heavily loaded bus with defective brakes

on the morning of the accident, a mistake that could hardly have been prevented by warning signs. It simply cannot be said that the accident would not have occurred if the United States had exercised ordinary care.

■ Susan Quinn was a normal child who engaged in regular activities prior to the accident. As a result of the accident, her spine was transected at the fourth thoracic vertebra, and she has absolutely no feeling below that level. Her motor level is at the sixth thoracic vertebra, below which she has no voluntary muscle function. Specifically, her lower vertebral column is displaced to the right and alongside of the fifth and sixth thoracic vertebrae, which has resulted in severe overlapping of the ribs attached to these vertebrae, with a consequent reduction in breathing capacity. She has been confined to a hospital bed almost continuously since the date of the accident. She continually develops large decubitus or bed-pressure sores, one of which could only be closed by means of a skin graft. At present, she has pain in her back, chest and stomach, for which she takes constant medication; she frequently has spasms and convulsions; a catheter must be inserted daily, which necessitates trained assistance; she has no control over her bowels or urine; her condition will get progressively worse and eventual decalcification will take place; she will never regain neurologic function below the level of her injury; and she is far more subject to kidney and respiratory ailments than are individuals who enjoy good health. If she receives all necessary assistance and medical care and if she personally cooperates to the best of her ability, she has a life expectancy of approximately 50 years.

Susan's medical expenses reasonably incurred to date by Mr. Quinn amount to $42,673.40. Her current physician testified that the cost of her medical care alone will amount to $1,000 a month for the rest of her life. She will require practical nursing help almost constantly at a cost of $200 per week. She has also

suffered a loss of ability to earn in the future. Mrs. Quinn, who was familiar with the labor market in the community in which they live, testified that Susan's typing proficiency would have enabled her to hold at least the lowest typist classification, which would have resulted in earnings of at least $70 to $80 per week. She might have been expected to work until age 65.

The present value of Susan's medical expenses reasonably certain to be required in the future is $219,072.00. The present value of expenses reasonably certain to be incurred in the future for necessary domestic help in the form of practical nursing is $189,862.40. The present value of the loss of her ability to earn in the future is $65,800.28. It is extremely difficult to place a value on Susan's pain and suffering and the visible results and permanency of her injury, but the court is of the view that these three items total $100,000.00.

Therefore, judgment is being entered today for the plaintiff Thomas Quinn on his complaint against the defendant J. T. Crumley in the amount of $42,-673.40, and for the plaintiff First National Bank in Little Rock, Guardian of the Estate of Susan Quinn, against the defendant in the amount of $574,-734.68, and dismissing the complaint of both plaintiffs against the United States of America.