Jesse **HERNANDEZ** et al.,

v.

**UNITED STATES** of America.

**Civ. A. No. 1–240.**

United States District Court,
N. D. Texas,
Abilene Division.

Oct. 4, 1969.

Tom Webb, San Angelo, Tex., Malcolm Schulz, Abilene, Tex., W. James Kronzer, Houston, Tex., for plaintiffs.

Kenneth J. Mighell, Asst. U. S. Atty., Dallas, Tex., for the Government.

## OPINION

BREWSTER, District Judge.

This action was brought under the Federal Tort Claims Act for damages for personal injuries to Jesse Hernandez, an

adult, and Joe Rodriguez, a minor, and for the deaths of Salvador Hernandez, an adult, and of Jesse Rodriguez, a minor, resulting from an explosion on November 29, 1964 of a 37 millimeter warhead on a ranch in Taylor County, Texas, which had been a part of a United States Army artillery .practice range during World War II.

The explosion happened on a ranch owned by Clyde Sears, located about twenty-eight miles southwest of Abilene, Texas. All injured parties were invitees on the ranch. Jesse and Salvador Hernandez, brothers, worked there as ranch hands. Joe and Jesse Rodriguez, their nephews, were visiting them at the time.

During World War II, the United States of America acquired about 23,000 acres of range land in the vicinity of Camp Barkley, an army training base. The Clyde Sears ranch was included in the land so acquired. The possession of it was obtained under a lease which stated that it was to be used as a "Training and Maneuver Area and Artillery and Firing Range and for such other purpose as may be deemed necessary by the United States of America." It was under the jurisdiction and control of the United States Army during the period from July 1, 1943, until it was returned to the owner on December 20, 1946, following the closing of Camp Barkley.

The plaintiffs are Jesse Hernandez suing for himself; David Rodriguez, father of Jesse and Joe Rodriguez, suing individually and as next friend for Joe and as temporary administrator of Jesse Rodriguez' estate; and Paula Hernandez, widow of Salvador Hernandez, suing individually and as temporary administratrix of Salvador's estate.

The plaintiffs claim that the defendant knew, or should have known, of the presence of a large number of unexploded ammunition or warheads left on the premises in question when they were released for civilian use; that it was charged with the duty of exercising the high degree of care that would have been used by a very cautious and prudent person under the same or similar circumstances to protect persons on the premises from injury from explosion of such warheads; and that the explosion in question and resulting tragedies were proximately caused by the negligence of the defendant in not using that degree of care in each of the following particulars: [1]

1. In failing to inspect the area for dangerous instrumentalities such as the shell that exploded;

2. In failing to erect and maintain devices to warn the public of the potentially dangerous propensities of shells such as the one in question.

The defendant's claims are summarized in the following statement taken from its trial memorandum on file herein:

"The Government's defense in this case involves the following legal theories: (1) The duty of the United States to these plaintiffs has been fully performed; (2) the plaintiffs herein are guilty of contributory negligence; (3) the damages alleged herein were the result of the intervening actions of the plaintiffs and were not caused by the negligence of the United States of America, if any; (4) any potential liability of the United States of America ceased when the land was returned to the lessor on December 20, 1946."

---

1. Nine grounds of negligence were alleged, but there was an overlapping or duplication in some instances. By way of illustration, the allegation of failure to use the proper degree of care in making the inspection set forth in subparagraph 1 above, overlaps the allegation of failure to use electrical or other available scientific detection devices in making the inspection. The particulars above set forth are the only ones the Court considers material to the disposition of the case.

There is little dispute about most of the facts[2] leading up to the explosion and about the injuries sustained by the four persons as a result thereof. The main argument is over the inferences and conclusions to be drawn from such facts and the law applicable to this case.

The section[3] of land in the Clyde Sears Ranch on which the warhead in question was found was identified as Section E–502 on the plat of the Camp Barkley area admitted in evidence. While Section E–502 was not in the area where accurately fired artillery projectiles were supposed to hit, it was in the artillery range and close enough to the impact area that many artillery warheads missing their targets landed on it. Numerous unexploded artillery projectiles were found on Section E–502 and other lands in the immediate vicinity of the artillery impact area both before and after the Clyde Sears Ranch was returned to its owner for civilian use. They were still being found up to the time of the trial. Some of the duds were explosive and others were not. Mr. Clyde Sears' testimony described those found in the later years after the ranch was turned back as usually being "rusty as heck".

The closing of Camp Barkley took place soon after the end of World War II. For several years after such closing the Army, through the news media and personal contact with the ranchers, urged that any artillery duds found on the land formerly making up Camp Barkley be flagged and not touched, and that notice of such finds be given the Army at Fort Hood, a little over 150 miles from Camp Barkley. A demolition squad from Fort Hood answered such calls and either exploded or removed the duds. While the squad put many of such projectiles in their Jeep and hauled them away, they usually tried to explode 37 millimeter shells where they were found, without handling them, on account of

their sensitivity. Fort Hood was still in operation at the time of the explosion in question, and its demolition squad continued to render safe any known ordnance on the lands formerly making up Camp Barkley. However, the intensity of its efforts to keep persons on such lands aware of the possible presence of unexploded projectiles and the danger from handling them decreased rapidly after three years or so following the return of the Camp Barkley lands to their owners.

No portion of the Clyde Sears Ranch, or any other part of Camp Barkley as far as the evidence shows, was declared to be wasteland when the Camp was liquidated. All of it was placed in a surplus category and returned to civilian use. In regard to lands of that type, War Department Circular No. 195, dated June 20, 1945, which was in full force and effect at all times material in this case provided:

" * * * Large areas of land have been acquired or leased by the United States for use as maneuver areas, target ranges, bombing ranges, and gunnery ranges. A great portion of such lands will eventually be placed in a surplus category by the War Department and released for civilian use. Any unexploded ammunition or duds which remain on these lands will render them unfit for civilian use unless the areas are neutralized to remove any possible danger to persons, animals or personal property. It is the obligation of the War Department in the interest of the United States to restore such areas by locating and removing or neutralizing, so far as practicable, all explosives which remain thereon."

Prior to the time the Clyde Sears Ranch was released for civilian use, and at all times thereafter up to the occasion in question, the defendant had

---

2. This statement does not relate to the opinion testimony of the witnesses who testified as experts on matters relating to 37 millimeter warheads and to the explosion itself.

3. For identification, the Army maps had the 23,000 acre artillery range divided into plots which were sometimes referred to as "sections".

actual knowledge of the fact that many unspent, explosive artillery projectiles landed on Section E–502 and other lands similarly situated in Camp Barkley. It had constructive knowledge at all times after the land was returned to civilian use that in reasonable probability warheads such as the one here involved still remained on Section E–502 and other such land. The inspection made by it to locate and remove the unexploded duds was wholly inadequate, whether its conduct is measured by the degree of care that an ordinarily prudent person similarly situated would have used under the circumstances, or by the standard of care that a very cautious and prudent person would have exercised.

The defendant's effort to inspect and remove unspent artillery projectiles from the Camp Barkley land to be released for civilian use occurred in the period between June, 1945 and July, 1946. It was not a continuous effort, but the total time of all the work was about two months spread over approximately a year. About 32,605 man hours were devoted to policing the entire 23,000 acre artillery range during the effort. The plan was to spread men out fifteen to twenty feet apart and have them walk the land, tract by tract, in one direction. They were then lined up so as to walk across the tract at right angles to the line of the first trek. German prisoners of war, with enlisted men as supervisors, were used for walkers in the first stages of the inspection and clearance program. For reasons that would be obvious to almost anyone, that plan proved to be unsatisfactory. The prisoners displayed no

interest in finding projectiles, and they were replaced by employed civilian laborers after ten days or two weeks. The artillery impact area composed only a small portion of the total land to be policed; but about sixty to sixty-five percent of the time and effort used in such project was devoted to it.[4] Except for the copy of Captain Pope's report hereinafter mentioned, the defendant did not produce the records showing what was done, as was demanded by the plaintiffs. It said that such records could not be found and had probably been destroyed.[5] The only witness who had had any personal connection with the preparation of the land in the artillery range for return to civilian use was Captain [6] Benjamin W. Pope, who was in charge of the project. His best recollection was that his orders were "to go out and what we call police up the range and destroy the unexploded shells that we found, and to remove all car bodies and pieces of shrapnel that we might pick up." His memory as to what was done was hazy, and he was allowed to refresh his memory from a copy of a report he made.[7] Even then, he could not reliably say whether Section E–502 and other land similarly situated was policed in accordance with the plan above stated. It was walked only one way, instead of being criss-crossed.

No electronic or scientific metal detector device was used at any time, even though such devices were available and the defendant had knowledge that many projectiles were beneath the surface or were obscured by grass or brush. It was well known that some of those which were so buried would become visible as a result of erosion after a few years. Sec-

---

4. Plaintiffs' Exhibits 10 and 11 show the area that the Army considered should be policed for unspent artillery projectiles in accordance with War Department Circular No. 195. Section E–502 was within that area. These exhibits also identify the impact area.

5. There is no basis for drawing an inference of bad faith in this connection. The Court does not believe that the defendant was suppressing evidence. It was

not surprising that such records would be unavailable after a lapse of fifteen years.

6. This was his rank when he retired. He enlisted in the Army, and served 31 years. Most of that time was as a private or as a non-commissioned officer.

7. This was the only record of this policing project produced for the trial. The witness said he just happened to have it— "Why I had it, I don't know. Ordinarily we don't keep such things for our private files."

tion E-502 was range land covered by grass and brush. Some of it was rough land which could be covered only on foot or on horseback. It was never burned off for the inspection so as to get rid of the brush and grass to make the unspent missiles more visible. The defendant had a right to burn it off for that purpose; and, in the course of the inspection and clean-up program, it did actually burn off some other lands in the area. That Captain Pope himself realized that the "police" work was far from adequate is evidenced by the fact that when he finished, he recommended that the land in the artillery range be used for grazing, and not for farming, on account of the dangers that might be involved in cultivation. That recommendation certainly put the defendant on notice that a substantial quantity of unspent, explosive missiles was in reasonable probability on the premises when they were returned to their owners.

There is no dispute over the inadequacy of signs in the artillery range area warning the public of the danger of handling artillery projectiles which might be found in such area. The following is quoted from the official report of Lieutenant Wade H. Paschal, the officer designated by the Army to make the investigation of the explosion in question:

"When the government departed the area, there were left unexploded shells in the target area. Warning signs were provided around the target areas to keep the public out. These signs deteriorated and now there is only one left standing. It is located 15 miles from the area where the shell was found and it is in a state of disrepair. (Exhibits N, O & P). The whole area is fenced however, by the ranchers in the area, and Mr. Sears has No Trespassing signs posted."

"There were not sufficient warning signs to warn the public of danger from projectiles on the area, that, in fact, there are projectiles on the area * * * "

"The area where the shell was found is located about 1½ miles off U.S. Highway 277 on Government Plot E-502. This area is 28 miles south of Abilene, Texas, and 7 miles north of Wingate, Texas. The area is posted by Mr. Sears: No Trespassing Allowed and is fenced. There is only one Government warning sign standing and it is in a bad state of repair and cannot be read. (See EXHIBIT H). This sign is located approximately 14 miles north of the Sears Ranch on Highway 277. The whole range area is not easily accessible except on foot or in a truck since the area is fenced and posted and there is only one through road that passes through the area, that being located 10 miles north of the Sears Ranch, and even the area along this road is fenced and posted. There are no Government warning signs, though."

The other evidence supports the findings of the investigating officer set out in the above quotations, and the Court finds the facts in regard to the warning signs to be as so stated.

If the Hernandez brothers had been the only ones involved with the 37 millimeter warhead, the conclusion would have to be that even an adequate, readable sign would have availed them nothing on account of their illiteracy. However, the Rodriguez boys who were involved in the explosion were far enough along in school that they could have read and understood such a warning, and have transmitted it to the Hernandez brothers in time to have avoided the explosion. In the Court's opinion, that would in reasonable probability have been done if adequate warning signs had been provided.

Jesse Hernandez, 31 years old, was ranch foreman on the Clyde Sears spread, and Salvador Hernandez, 21 years old, was a ranch hand under him. They lived in separate houses on the ranch furnished them as part of their compensation. They were born in Texas of Latin American parents, but both of them were illiterate. Neither one them

had ever done any kind of work except plain, manual labor.

The Rodriguez family was related to the Hernandez brothers. The parents of Joe and Jesse Rodriguez, who lived in Knox City, Texas, had left the boys with the Hernandez for a few days while they went to Menard to visit other relatives. On Sunday prior to the explosion, Jesse and Salvador Hernandez and Joe Rodriguez went hunting on the ranch. During the hunt, Jesse found the 37 millimeter projectile in a pasture. It was about the size of a coke bottle and looked like a large bullet. He thought it was harmless, and put it in his pocket and continued hunting. When they finished, he laid it loose on the bed of the ranch pickup. It remained there for three days while the pickup was used by Jesse and possibly by Mr. Sears for ranch work. Salvador then got it out of the truck to take to his house to show it to his wife. After she saw it, it stayed on the porch of his house during the time he had it. His wife would move it around with her foot to get it out of her way when she swept the porch. Jesse Hernandez then picked it up and put it in the gun rack at his house, where it remained until Jesse took it with him to Salvador's house on the morning of Sunday, November 29, 1964.

The explosion happened about 9:30 on that morning. Jesse and Salvador Hernandez and Jesse and Joe Rodriguez were outside Salvador's house in the area of the front porch while Salvador's wife was preparing breakfast. The Hernandez brothers were sitting near each other on the edge of the porch. The teenage Rodriguez boys were sitting on the edge of the porch next to Salvador. Jesse Hernandez was looking at the 37 millimeter missile as he had it between his legs with its nose pointed downward. There was a noise in the shell corresponding to that caused by the breaking of a match and the shell exploded. Immediately after the explosion, Jesse Hernandez was lying on the porch with both legs and all the fingers on his right hand mangled and a shell fragment

in his abdomen. He never lost consciousness. Salvador had been blown off the porch and was lying on the ground near the yard fence. He was mortally wounded from scraps of metal in his chest and died shortly after reaching the hospital almost two hours later, but he was conscious almost to the last. Joe Rodriguez, though seriously injured, was on his feet on the ground near the porch when Salvador's wife came out to see what had happened. Jesse Rodriguez died from his injuries within a short time, without any conscious pain and suffering.

Even though the accident happened around 9:30, it was about 11:15 before the injured persons reached the hospital. The ranch was in a sparsely settled area, and there was apparently no telephone in Salvador's house. A neighbor had to drive to the public road and some distance down it to get to a place where he could call an ambulance. It had to come about 28 miles from Abilene, the nearest town with a hospital capable of caring for such serious injuries. Neighbors cut the wire fence around the yard so the ambulance could reach the persons injured. There was no way to relieve or lessen the suffering of Jesse or Salvador Hernandez or Joe Rodriguez during the waiting period.

The type of the projectile in question was determined from the base of the fuze which a State Highway Patrolman found embedded in the wooden ceiling of Salvador's front porch shortly after the explosion. The fragment was from the kind of supersensitive fuze that was used in 37 millimeter high explosive shells. The description given by witnesses of the size and shape of the missile corroborated the fact that it was that kind of ammunition. The 37 millimeter shell was discontinued shortly after World War II. The projectile itself contained three charges of explosives. The first was lead azide in the fuze located in the nose of the missile. The intermediate detonator, directly behind the fuze, contained tetro. Behind that was the main and largest charge. Those ex-

plosives varied in degree of sensibility, with lead azide being the most sensitive and TNT, the least. The lead azide was supposed to explode first, with the tetro and TNT following in quick succession. Diagrams of this type of warhead were offered in evidence. They showed that the striker on the inside of the shell was prevented from coming in contact with the fuze or detonator by a sleeve and a spring. Under normal functioning, the impact resulting when the projectile struck something after the shell was fired would cause the spring to compress so as to enable the striker to slide down the metal sleeve and come in contact with the fuze, and such contact would cause the projectile to explode. The warhead had no consistent pattern for fragmentation. The experts on explosives testified that there were numerous reasons why some of this type of missiles did not explode in a normal manner. The government witness, Lewis Jezek, an Army Explosive Safety Engineer with thirty years experience in ordnance, gave the following as some of the reasons for malfunction of the 37 millimeter projectiles: " * * * Some of the ammunition was old and some was put together too rapidly on an assembly line procedure. Various things can cause malfunction."

A warhead, exposed as this one was, became less predictable with time.[8] Aging and rusting could reduce the strength of the spring which prevents the striker from contacting the fuze.[9] Those factors could also make the fuze itself more sensitive. A 37 millimeter missile sometimes became more easily affected not only by impact but by movement after aging. The fact that the Army demolition squad always tried to explode the 37 millimeters on the spot, without any handling at all, shows that it recognized the potential danger from any movement of them.

The experts offered by the government said that it was always very difficult to explain an explosion such as this one.[10] When the Army investigator found out that wirecutters were seen on the porch after the explosion, he at first assumed that Jesse Hernandez was probably using them to tinker with the projectile. It was established to the satisfaction of the Court, however, that such wirecutters were left at Salvador's place by the persons who cut the wire fence after the explosion to enable the ambulance to drive up in the yard, and that Jesse had no tool of any kind in his hands during the time he was handling the projectile as he sat on the porch. The fact that this missile did not explode when it struck the ground after being fired showed that it did not function normally. It became more sensitive and unpredictable[11] as it lay out in the weather for over eighteen years. The Court is convinced that the explosion re-

8. Robert M. Shelley, Army Senior Explosive Ordnance Disposal Specialist, testified:

"Natural forces taking place inside the 37 millimeter round will cause the warhead to become less predictable as to how much impact on the nose of the shell is required * * * "

9. Mr. Shelley further testified:

"The aging and rusting away of the spring mechanism in the 37 millimeter warhead reduces the strength of the spring. Since the primary function of the spring is to retard the forward movement of the striker and sleeve, as the spring weakens with age and rusting, it takes progressively less impact to cause the striker and sleeve to compress the spring and contact the detonator * * * "

10. The following is quoted from Mr. Jezek's testimony:

"Q And there is no uniform way in which you can state that the shell itself became a dud or unexploded?

"A Very difficult to decide. How can you tell? I can give you some probabilities but the exact cause, no."

11. In illustrating the unpredictability of this very shell, Mr. Jezek testified:

" * * * You have heard the testimony here where somebody kicked this shell, probably on its side, and nothing happened. Yet on the other hand, you may do that 10 or 15 times and maybe 33 times, and the 34th time you do it, you may have an accident."

sulted from the casual handling of it by Jesse, even though there was nothing rough about the handling. This was not a normal shell and it did not require normal impact for detonation.

The government argues that it cannot possibly be liable under the circumstances because it surrendered possession of the premises when they were returned to the owner on December 20, 1946. It claims that its position is supported by United States v. Inmon, 5 Cir., 205 F.2d 681 (1953). That was a case in which recovery was denied to a licensee who entered the premises in question in spite of warning signs expressly advising of the dangers and of instructions on the container of the blasting caps disclosing that they were dangerous. The licensee, a boy fourteen years of age, paid no heed to such warnings, and was injured by the explosion of a blasting cap he found on the premises after the government had returned them to private ownership upon its closing of Camp Wolters after World War II. The Court of Appeals gave several grounds for holding that there was no liability: (1) The special liability of a landowner for the dangerous condition of premises is not a respondeat superior type of liability which would afford a basis for recovery under the Federal Tort Claims Act. (2) Even if it were, the liability ceased upon transfer of the possession and control of the premises. (3) Under the negligence theory, there could be no liability because: (a) the government gave adequate warning and used due care to make the premises reasonably safe, and (b) the injured party's negligence was a contributing cause of his injury. The discussion in the *Inmon* opinion of the defective premises theory has no application to the case *sub judice.* Recovery here does not depend upon a dangerous condition of the land or any fixtures thereon. The chattel which caused the injuries was never legally affixed to or a part of the premises. In the defective premises cases, the relationship of the plaintiff (invitee, licensee or trespasser) and the defendant (owner or occupier of premises) is an indispensable factor to be considered. Those matters are not controlling in this case, as the liability here is "based upon the general duty of care owed by all persons to safeguard others". Annotation—Liability of vendor or grantor of real estate for personal injury to purchaser or third persons due to defective condition of premises. 8 A.L.R.2d 218, 219. This distinction has been recognized in two cases brought under the Federal Tort Claims Act. Parrott v. United States, D.C.S.D.Cal., 181 F.Supp. 425, 429 (1960), and Medlin v. United States, D.C. W.D.S.C., 244 F.Supp. 403, 406 (1965). The following is quoted from the *Parrott* case, at page 429:

"In the case here decided there was nothing wrong with the land or with any fixtures thereon. Highly dangerous small chattels were negligently left upon the land. In this type of case courts have no reason to discuss the rule. For instance, in Kelley v. Black, 203 Ga. 589, 47 S.E.2d 802, where a vendor of property threw a partially filled can of anti-freeze into some high weeds before terminating his estate, he was held liable when two children of the vendee were killed when the can exploded while weeds were being burned. Also, in Eckart v. Kiel, 123 Minn. 114, 143 N.W. 122, where the grantor left dynamite caps upon land and these injured the child of the purchaser, recovery was allowed upon general principles of liability. In neither case was the rule here urged by the defendant discussed by the court. *The courts, in the cases just briefly summarized, recognized that the basic situation was one of negligence concerning chattels. The negligence was inherent in a situation rather than incidental to an ownership.* Hence, there was no reason to bring into play a rule which, although indexed under 'Negligence', is actually a hybrid of property and negligence law. In cases like Kelley v. Black, concerning anti-freeze thrown into weeds, or Eckart v. Kiel, the dynamite caps case, the courts

recognized that they were dealing with negligence or lack of care respecting chattels. The Reporter for the Restatement of Torts, Professor Bohlen, in one of his respected texts, points out that *liability arising out of a dangerous condition of the premises themselves should pass with title to the premises, but comments that a tort feasor should not be relieved from liability for a negligent act solely because the act was committed upon land which he has since conveyed.*

'The liability depends upon an act wrongful by whomsoever done and does not depend on ownership or possession, and there seems, therefore, no reason why, simply because the wrongdoer happens to be the owner, his liability should be terminated by the alienation of the scene of the wrong.'

"It does not appear, then, that this court must apply section 352 to this case, even though that rule has been adopted by the California courts. As indicated, the California cases and the out-of-state decisions upon which they rely have held the transferor of the premises free from liability only in instances where injuries have resulted from defects in the condition of the land or of buildings. *In those cases, the duty of care is dependent upon ownership or possession, and it is reasonable to terminate the duty upon transfer.* Neither of the California decisions has concerned a negligent act of the defendant, wrongful independent of ownership, for which redress is sought subsequent to transfer of the property upon which the act was committed. In such a case, the defendant must act in accord with that general duty of reasonable care to which all persons must comply."

In the Medlin case, an eleven year old boy was injured by the explosion of a pyrotechnic device (a gunflash simula-

tor) resulting from his trying to light the device. The Army had left it on some land it had occupied as a military camp during maneuvers. The boy found it on the premises after they had been released by the government to the private owners. He had taken it to his home away from such premises before he was injured. The Court recognized that the government could not be held liable under the defective premises theory, but allowed a recovery on account of the government's negligence in the particulars appearing in the following quotation from the opinion 244 F.Supp. at page 406:

"This Court concludes that there is sufficient evidence of failure of Army personnel to properly police, or clean up, the area, upon completion of maneuvers. If such action were not proper, expected, or required, maneuver areas would be constant, conscious, arenas of danger and injury. Neither the law, nor custom, expects or condones such a policy."

Since the transaction giving rise to this cause of action occurred in Texas, the law of that State will determine whether plaintiffs are entitled to a recovery. 28 U.S.C.A. Sec. 1346(b). The standard of care required in Texas of persons using or having the custody of explosives is set out in 25 Tex.Jur.2d, p. 70; Jagoe Construction Co. v. Harrison, Tex.Civ.App., 17 S.W.2d 861 (1929), no writ history; Atex Construction Co. v. Farrow, Tex.Civ.App., 71 S.W.2d 323, 325 (1934), writ refused; McAfee v. Travis Gas Corp., 137 Tex. 314, 153 S.W.2d 442, 447 (1941); Robert R. Walker, Inc. v. Burgdorf, 150 Tex. 603, 244 S.W.2d 506, 509 (1951); Dezendorf Marble Co. v. Gartman, 161 Tex. 535, 343 S.W.2d 441 (1961).[12] ¶ 25 Tex. Jur.2d, p. 70, states the rule to be:

"The owner or controller of dangerous materials such as explosives is bound to exercise great care to prevent

12. There is no substantial difference in the standard of care laid down by the Texas courts and that followed in most jurisdictions. 35 C.J.S. Explosives, p.

255, states the generally accepted rule to be:

" * * * The degree of care required as to explosives, as in the case of other

the occurrence of an injury that a prudent man would reasonably foresee. The law exacts from persons who handle explosives and other dangerous commodities a duty to protect the public proportionate to and commensurate with the dangers involved * * *"

Jagoe Construction Co. v. Harrison, supra, quoted the following from 11 R.C.L. 662 with approval:

"The degree of care required of persons having the possession and control of dangerous explosives such as dynamite is of the highest. The utmost caution must be used to the end that harm may not come to others in coming in contact with it."

A more detailed statement of the Texas standard of care appears in the following language of the opinion in Atex Construction Co. v. Farrow, supra, quoted with approval by the Supreme Court of Texas in Dezendorf Marble Co. v. Gartman, supra,

"The authorities are legion holding that a master who uses dangerous instrumentalities, such as dynamite caps, in the prosecution of his business is charged with the highest degree of care in the custody and use thereof, and, when he intrusts them to a servant or employee, the proper custody and use thereof become a part of such servant's or employee's employment, and he must use the same degree of care and attention as the law requires of the master; and, when such dangerous instrumentalities are negligently permitted to escape the custody or possession of the servant or employee and injury is done to a third person, the master is liable for the consequences of such injury. The master is also liable for the passive negligence of his servant or employee in failing to safely keep such dangerous instrumentalities committed to his care in the discharge of the master's business and in failing to take proper precautions for the protection of the public. Branch v. I. & G. N. Ry. Co., 92 Tex. 288, 47 S.W. 974, 71 Am.St.Rep. 844; City of Lubbock v. Bagwell (Tex.Civ.App.) 206 S.W. 371, writ of error refused;" citing numerous other authorities from other states.

■■ The government failed to use the degree of care required under the Texas law in each of the particulars hereinbefore set forth; that is, in its inspection or policing of the premises before releasing them to their private owners, and in the character of notice of the potential danger involved in handling any missiles found on such premises. The ragged job of policing the premises where the missile in question was found, and the inadequate warning signs that actually amounted to no warning at all, fell far short of the claim by the defendant that, "The duty of the United States to these plaintiffs has been fully performed." Each of such omissions was negligence, and, taken either singly or together with each other, was a proximate cause of the injuries to Jesse Hernandez and Joe Rodriguez, and of the injuries to and deaths of Salvador Hernandez and Joe Rodriguez.[13] The facts

dangerous agencies, must be commensurate with the apparent danger, particularly to children and those of immature judgment * * *"

13. In Texas, proximate cause consists of two elements: cause-in-fact and reasonable foreseeability of some injury. 40 Tex.Jur.2d, pp. 468–477, and Phoenix Ref. Co. v. Tipps, 125 Tex. 69, 81 S.W. 2d 60, which says at p. 61: "Before it can be said that an act of negligence is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of such act of

negligence, and that the party committing the act ought reasonably to have foreseen such consequences in the light of attending circumstances." The Supreme Court of Texas, in Dezendorf Marble Co. v. Gartman, supra, 343 S.W. 2d at page 443, explained the foreseeability element as follows: " * * * The cases hold that all the defendant has to foresee is that someone would be injured by an explosion of the blasting cap. The details of how the explosion was triggered are not required to be foreseen. Foreseeability of some similar injury is all that is required * * *"

of this case do not support the government's contention that the chain of causation was broken by "the intervening actions of plaintiffs." Atex Construction Co. v. Farrow, McAfee v. Travis Gas Corp., Robert R. Walker, Inc. v. Burgdorf, and Dezendorf Marble Co. v. Gartman, all supra. The following quotation from the *McAfee* case, supra, 153 S.W.2d at page 447, gives the Texas rule as to intervening conduct of persons other than those connected with the defendant:

> "It is the rule that those who distribute a dangerous article or agent owe a degree of protection to the public proportionate to and commensurate with the dangers involved. Texas Pub. Serv. Co. v. Armstrong, Tex.Civ.App., 37 S.W.2d 294, writ ref., and authori-

ties there cited. We think it is the generally accepted rule as applied to torts that 'If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effect of a third person's innocent, tortuous or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.' * * * ''

The government claims that the injuried persons knew that it was dangerous to pick up and handle artillery projectiles which might be found on the ranch, and that their conduct on the occasion of the explosion was therefore negligence which contributed to cause their injuries.[14] The Court is of the

---

14. The government relied primarily upon evidence from two sources to establish that Jesse Hernandez knew and appreciated the danger from handling the projectiles—the testimony of Sears, the ranch owner, that he warned Jesse in 1956 of the danger of handling artillery duds, and the following statement in the report of the Army investigator of his September, 1966, investigation of these claims:

> "Jesse Hernandez, an illiterate Mexican-American, said that he had never been told not to pick up shells he might find, but that he knew better. He said that he found the shell that exploded in a pasture on the Sears Ranch and hauled it around in a truck for a week. He wanted to use it in a gun rack he had at his home, but his brother, Salvador, took the shell out of the truck and was using it as a door stop. Jesse said he had gone to Salvador's house to get the shell the morning of the explosion, 29 November 1964. He was showing the shell to his brother and his two nephews, twins Jessie and Joe Rodriguez of Knox City, Texas, when the shell exploded * * *''

Jesse Hernandez denied that he made the statement to the investigator and that he knew of any danger from handling the missile.

Without impugning the integrity of the ranch owner or of the investigator, the Court gives little or no weight to this evidence. The owner was on the defensive from being accused by the govern-

ment of having been guilty of negligence which caused the explosion. His testimony was somewhat vague. Prior to the time Jesse went to work permanently on the ranch in 1962, he had been there for only a week in 1956 as a temporary employee. The last time the owner had reported the finding of a dud on his ranch was in 1954. There was little likelihood that an occasion arose to give a warning after Jesse and Salvador became employees on the ranch. Jesse was illiterate and it was apparent during his testimony that he had some difficulty understanding English. If the ranch owner did discuss with him the danger of handling duds, he did not comprehend.

The statement to the investigator was made during an interview with Jesse after he had employed counsel, with no one present except Jesse and the investigator. He did not testify, so there was no opportunity to cross-examine him. The Court was of the opinion that the plaintiffs' objection to this portion of the report on the ground that it was hearsay and self-serving was well taken, (H. B. Zachry Company v. Travelers Indemnity Company, D.C.N.D.Tex., 262 F.Supp. 237, 240, reversed on other grounds, 391 F.2d 43) unless the excerpt was explanatory of or relevant to parts of the report previously offered by the plaintiffs. Since this was a non-jury trial, the Court tentatively admitted the evidence so as to have an opportunity to consider that matter further. The Court now has serious reservations about the

opinion that none of the four injured parties was guilty of negligence in any of the respects charged.

Under Texas law, mere knowledge that there might possibly be danger of injury in doing an act is not sufficient to establish contributory negligence. The facts must also establish that the injured party appreciated the danger from his act.[15] The following statement of the rule appears in 40 Tex.Jur.2d, at pp. 611–612:

"The plaintiff's knowledge of the danger of injury does not of itself constitute contributory negligence. It is the appreciation or opportunity to appreciate the peril that determines his right to recover for negligence. *It is not sufficient to constitute negligence that a party knew there might be danger in doing a given act, if he did not know positively that such act was dangerous * * *"* (Emphasis added)

The language in the last sentence of the quotation is taken from the opinions in San Angelo Water, Light & Power Co. v. Anderson and Northcutt v. Magnolia Petroleum Co., both supra, note 15.

The Court is of the opinion that the manner in which Jesse and Salvador handled the projectile shows that neither one of them either knew or appreciated the danger of handling it. They were illiterate and uninformed in matters of this kind. Some idea of their isolation from working in the big ranch and sparsely settled area can be gained from the distance that had to be travelled from Salvador's home to a telephone to call an ambulance. One of them was about 12 years old and the other one had not been born when Camp Barkley was closed. They came into the area long after the period when shells were being frequently found. They had never seen a projectile like the 37 millimeter one they had. It did not appear dangerous to them; and in their immature way, it was to them like a toy would be to a child. The instinct of self-preservation would have kept them from carrying it around in their hands, in their pockets and in the bed of the pickup, if they had had the least idea that it was dangerous. In addition, they would not have exposed their wives, their nephews or their employer to it. Their entire conduct was inconsistent with the claim that they knew and appreciated the danger from handling the projectile.

admissibility of this excerpt, but has decided that it would be better to evaluate it rather than exclude it.

Numerous cases are cited in II. B. Zachry Company v. Travelers Indemnity Company, supra, at page 241, in support of the proposition that investigative reports lack reliability. The Courts have been particularly skeptical of statements taken by investigators from injured persons under circumstances similar to those here. Logan v. Logan, Tex.Civ. App., 112 S.W.2d 515, writ dis., characterizes them as being "the weakest kind of evidence and subject to the closest scrutiny." McDonald v. United States, D.C.N.D.Tex.. 284 F.Supp. 978, 984, had this to say of a statement by an injured person made while suffering from his injuries: " * * * He could not have been thinking of giving his full side of the matter from the standpoint of legal fault. He was in no condition to reflect. The government would be outraged, and rightly so, if a statement given by an habitual criminal made under similar circumstances were offered against him on his trial for some heinous crime. It ought to show the same solicitude for the rights of a law-abiding man who was willing to work for what he got." McMillan v. Gage, Tex.Civ. App., 165 S.W.2d 754, 755. err. ref. want of merit, says of this character of declaration: "The law is well settled that an admission or declaration against interest is merely another piece of evidence; it is not conclusive on the party against whom it is offered, and the probative effect of it is a question of fact for the jury. * * *"

15. 40 Tex.Jr.2d, Negligence, Sec. 103, p. 611; San Angelo Water, Light and Power Co. v. Anderson, Tex.Civ.App., 244 S.W. 571, 572, writ dis. w. o. j.; Northcutt v. Magnolia Petroleum Co., Tex.Civ. App., 90 S.W.2d 632, 635, err. ref.; McAfee v. Travis Gas Corp., 137 Tex. 314, 153 S.W.2d 442, 447.

The measure of damages under Texas law[16] applies in this case. The annual income of Jesse and Salvador was not large enough for "the incidence of federal income taxation" to be an important factor, as it was in Hartz v. United States, 5 Cir., 415 F.2d 259 (1969).

The full details of the injuries received by the injured parties appear in the hospital and medical reports admitted without objection. There is also other evidence, both testimonial and documentary, in regard to the injuries, their effect and the pain and suffering. Since there is no issue as to the nature of the injuries, it will not be necessary to set them out in great detail.

The hospital records of Jesse Hernandez show that he had numerous penetrations from shell fragments. The more serious ones were "a large penetrating wound in the left upper quadrant of the abdomen which obviously had penetrated the entire abdominal walls," two penetrations in the right groin, and "another rather large penetrating wound just above the anterior superior iliac spine on the right." The fingers on his right hand and both his legs were so badly mangled that he had to have amputations of the thumb and all fingers

16. Where personal injuries are sustained, recovery is allowed of such sum as would, if presently paid in cash, fairly and reasonably compensate for the following elements of damage:

*Injured Person Living*

1. "[F]or the loss of time and earnings that he has sustained to the time of the trial and for such future loss that he will suffer owing to his impaired earning capacity to labor and earn money * * *." 17 Tex.Jur.2d, p. 176. If the injured party is a minor child, the parents are entitled to recover for the loss of his earnings and services during his minority. A recovery is allowed the minor himself "for an impairment to the earning capacity that, had the injury not occurred, he could reasonably expected to have achieved." 17 Tex.Jur.2d, p. 180; Texas & P. Ry. Co. v. Perkins, Tex.Civ.App., 284 S.W. 683, writ dis.

2. Such physical pain and mental anguish as injured party may have suffered to time of trial and as he will in reasonable probability suffer thereafter. 17 Tex.Jur.2d, pp. 183–184, 189 et seq. Mental anguish means "poignant mental suffering", which includes "contemplation of the maimed, crippled and disfigured condition to which plaintiff is reduced" by his injuries. 17 Tex.Jur.2d, pp. 192–193.

3. The reasonable cost of any hospital, medical and nursing services, and drugs necessary for the treatment of the injuries. 17 Tex.Jur.2d, p. 101. Where the injured party is a minor, the parent is liable for such items and may recover therefor. 17 Tex.Jur.2d, p. 102.

*Injuries Resulting in Death*

Damages are likewise compensatory only where the suit is based on personal injuries resulting in death. There can be no recovery for grief or sorrow. 17 Tex.Jur.2d, pp. 601, 602. Any recovery must be calculated on the basis of the shorter life expectancy as between the deceased and the plaintiff. Humble Oil & Ref. Co. v. Ooley, 46 S.W.2d 1038, writ ref. 17 Tex.Jur.2d, pp. 601, 602. Where the suit is by a parent for death of a minor child, he may recover, in addition to his actual, reasonable expenses for hospital, medical and burial expenses, such amount as may be necessary to compensate him for loss of the child's services during minority, and for financial contributions the parent could reasonably expect to receive from the child after reaching majority. 17 Tex.Jur.2d, p. 601.

If the deceased lives for a time after receiving his injuries, the personal representative of his estate can recover damages for conscious pain and suffering caused by the injuries. Art. 5525, Vernon's Ann.Tex.Civ.Statutes, 17 Tex.Jur. 2d, p. 595; Landers v. B. F. Goodrich Co., Tex., 369 S.W.2d 32 (1963); Mitchell v. Akers, Tex.Civ.App., 401 S.W.2d 907, writ. ref. n. r. e.

17 Tex.Jur.2d, pp. 602, 603, has this to say about the measure of damages in an action by a wife for loss of her husband:

"When a wife sues for the wrongful death of her husband, the measure of damages is such a sum of money as, if presently paid, will reasonably compensate her for the pecuniary loss sustained through the death, excluding any allowance for loss of companionship or as a solace for grief. * * *"

"The pecuniary loss sustained by a wife includes not only such contributions from the earnings of the deceased as he might have made toward her support, but also the value of his attention, care, and counsel. * * *"

on that hand and of each leg about half way or more above the knee. An operation on his abdomen was also necessary to remove a shell fragment. His hospital record gave this summary description of the injuries to his legs: "There were extensive and severe wounds of both lower extremities above the knee which included chewing-up of the muscle and extensive destruction of the bone, and apparently the blood vessels since both feet were cold and had no circulation * * *" He was in severe shock, but was conscious from the time he was hurt until he got to the hospital. He has suffered excruciating pain and mental anguish, and will continue to endure mental anguish and some pain for the balance of his life. His stubs are so short that he will always have problems with his artificial legs. The report of his physician, Dr. Bowyer, a Diplomate American Board of Surgery, says that he is practically totally disabled to do any work for which he had knowledge or training. The earning capacity of this illiterate Mexican-American who did not go beyond the first grade in school, and who knew no means of livelihood except that involving manual labor, has been practically destroyed. Ironical as it may seem, this right-handed man with no thumb or fingers on that hand and with no feet, is in some kind of program for the handicapped where he is trying to learn to be a shoe cobbler. $20.00 per week for that effort for a few months before the trial represents all that he has been able to make since he was hurt. It is obvious that his capacity to earn money in the future will be extremely limited. Jesse was 32 years old at the time of the explosion, and had a life expectancy of 38.5 years. He had always been in robust health. He was earning $160.00 a month, plus a house on the ranch to live in, and was furnished a milk cow and some of his table meat. It is reasonably probable that his salary would have increased from time to time. He is

entitled to recover $150,000.00 for the physical pain and mental anguish heretofore caused and hereinafter in reasonable probability to be caused by his injuries, $50,000.00 for loss of earnings to the date of the trial and for loss of earning capacity for the balance of his life following the trial, and $1957.95 for reasonable cost of hospital, medical and drug expenses made necessary by his injuries.

Salvador Hernandez was 22 years old at the time he was killed, and had a life expectancy of 47.7 years. He was also in good health. His wife, Paula, one of the plaintiffs herein was 19 years of age at that time and had a life expectancy of 57.6 years. They had been married about 4 years. Salvador had supported her during that time, and would have continued to do so as long as both of them were alive. Salvador's earning capacity was about the same as that of his brother, Jesse. His injuries have already been described. He suffered excruciating, conscious pain and mental anguish from his injuries until his death. He realized all that time that he was going to die.[17] Paula Hernandez is entitled to recover $35,000.00 in her individual capacity as reasonable compensation for the pecuniary loss she has suffered as a result of Salvador's death. In her capacity as temporary executrix of the estate of Salvador Hernandez, she is entitled to recover $40,000.00 for Salvador's conscious pain and suffering from his injuries, and $839.00 as reasonable and necessary expenses for his burial.

Joe and Jesse Rodriguez were twin brothers, 14 years of age at the time of the explosion, with life expectancies of 55.1 years. Their health was good. They were going to high school at Knox City, and were helping with the chores around the house. They were engaged in the normal activities of boys their age, including basketball and football. They were fine, stable, dependable

---

17. " * * * Consciousness of approaching death is a proper element to be considered in evaluating mental suffering * * *" Jenkins v. Hennigan, Tex.Civ. App., 298 S.W.2d 905, 911, writ ref. n. r. e.; 17 Tex.Jur.2d, p. 194.

364

children. They were two of the eleven children born to the marriage of David and Domingo Rodriguez. The ages of the other children were not given, but the testimony shows that two of them are grown and married.

Shell fragments from the explosion entered Joe's chest, stomach, legs and right arm. There were three penetrations in the chest and abdomen area, a few in his legs and a number of them in his right arm. He was hospitalized for about a month, and the reasonable cost of his necessary hospital and medical expenses was $2200.25. He still has some weakness in his right arm, and is bothered at times by internal pains in the area of the wounds in the front of his body. A reading of the hospital records discloses that this boy suffered extreme physical pain. There are notations of numerous outcries from pain in spite of the sedatives. He has also suffered some mental distress that comes within the term mental anguish. However, in spite of complications that developed from the wounds inflicted by the bits of rusty metal, Joe has made miraculous progress and will suffer no permanent disability. His father, David Rodriguez, in the capacity as next friend of Joe, is entitled to recover the sum of $15,000.00 for Joe's use and benefit, and, in his individual capacity, the sum of $2200.25 for Joe's hospital and medical expenses.

 Jesse Rodriguez died shortly after he was injured. He was never conscious after the explosion, so there can be no recovery for conscious pain and suffering. The reasonable cost of his burial was $860.57, which the father is entitled to recover.

The father of the Rodriguez boys was 68 years old at the time of the explosion and had a life expectancy of 9.9 years. The mother was 41 years old and had a life expectancy of 36.6 years. All of the children born to their marriage were living except Jesse.

When the comparative ages of David Rodriguez and his boys, Joe and Jesse, are considered along with the other circumstances of the case, the evidence fails to show that he suffered any pecuniary damages as a result of the tragedy. He would likely not have lived beyond their minority. The expenses of their maintenance and education would have more than offset the pecuniary value to him and his wife of any services of Joe and Jesse during their minority. With state and government benefits to take care of parents during their old age, and with eleven children to divide any responsibility of support beyond such benefits, the probability of substantial contributions by Joe and Jesse to their mother after reaching their majority was remote. The law does not allow compensation for the real damages suffered by these good parents—their grief, sorrow and loss of companionship.

This opinion will serve as the findings of fact and conclusions of law in this case. Rule 52(a), F.R.Civ.P. Judgment will be entered in accordance therewith.